[Civ. No. 22751. First Dist., Div. One. Feb. 8, 1966.]

In re DAVID NATHANIEL BACON, a Person Coming Under the Juvenile Court Law.
LORENZO BUCKLEY, as Chief County Probation Officer, etc., Plaintiff and Respondent, v. DAVID NATHANIEL BACON, Defendant and Appellant.

[Civ. No. 22752. First Dist., Div. One. Feb. 8, 1966.]

In re MARK DINABURG, a Person Coming Under the Juvenile Court Law.
LORENZO BUCKLEY, as Chief County Probation Officer, etc., Plaintiff and Respondent, v. MARK DINABURG, Defendant and Appellant.

[Civ. No. 22753. First Dist., Div. One. Feb. 8, 1966.]

In re MICHAEL HOWARD, a Person Coming Under the Juvenile Court Law.

LORENZO BUCKLEY, as Chief County Probation Officer, etc., Plaintiff and Respondent, v. MICHAEL HOWARD, Defendant and Appellant.

[Civ. No. 22933. First Dist., Div. One. Feb. 8, 1966.]

In re JACK NICHOLAS RADEY, a Person Coming Under the Juvenile Court Law.

LORENZO BUCKLEY, as Chief County Probation Officer, etc., Plaintiff and Respondent, v. JACK NICHOLAS RADEY, Defendant and Appellant.

(Consolidated Cases.)

40

Robert Truehaft, Irving N. Bloom, Joel Goldfarb, John J. Dunn, and Milton Nason for Defendants and Appellants.

Malcolm Burnstein, Richard Buxbaum, Henry M. Elson, Stanley Golde, Douglas J. Hill and Norman Leonard as Amici Curiae on behalf of Defendants and Appellants.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

MOLINARI, J. — Appellants, David Nathaniel Bacon, Mark Dinaburg, Michael Howard, and Jack Nicholas Radey, appeal from the respective orders of the Alameda County Superior Court, in session as a juvenile court, which orders determined that each of these minors violated Penal Code sections 148, 409, and 602, subdivision (o), and that each be placed on probation without wardship upon the condition that he be of good conduct and obey all laws; obey parents; maintain good school attendance, behavior and performance; report to and follow directions of the probation officer; and spend four weekends at the probation department's Training Academy, the probation officer being authorized, at his discretion, to reduce this time to two weekends. Each of these matters is pending before this court as a separate appeal, although a joint brief raising identical issues as to each case has been filed by appellants. Accordingly, we consider these four appeals together.

### Statement of the Case

On December 4, 1964 an officer of the Alameda County Probation Department filed a petition in the juvenile court alleging that appellant Bacon was under 21 years of age; that he had engaged in conduct violative of Penal Code sections 148 (resisting or delaying an officer), 409 (unlawful assembly), and 602, subdivision (o) (failure to leave a public building after closing time); and that as a result of his conduct and pursuant to the provisions of Welfare and Institutions Code section 602[1] he came within the jurisdiction of the juvenile court. Accordingly, the petition requested that he be declared a ward of the juvenile court. On December 7 and 8, 1964 and February 9, 1965, respectively, similar petitions were filed in regard to appellants Dinaburg, Howard, and Radey.

The matters relating to Bacon, Dinaburg, and Howard came on for a consolidated hearing on December 22, 1964; that of Radey was heard on March 18, 1965. Prior to both hearings the probation department had filed with the court extensive reports with respect to each of appellants. On December 22, 1964 the juvenile court placed Bacon, Dina-

---

[1]This section provides as follows: ''Any person under the age of 21 years who violates any law of this State or of the United States or any ordinance of any city or county of this State defining crime or who, after having been found by the juvenile court to be a person described by Section 601, fails to obey any lawful order of the juvenile court, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court.''

burg, and Howard on probation without wardship upon the conditions set forth above. A similar order was entered by the court in the Radey matter on March 18, 1965.

## The Facts

On the afternoon of December 2, 1964 appellants, who were students at the Berkeley Campus of the University of California, had gathered, along with other University of California students, inside the University Administration Building, Sproul Hall, to express to the administration their grievance with the university rules regulating the content of student speech, assembly and petition on the campus. At 7 p.m., when Sproul Hall was closed for the day, a number of the protesters were still in the building. During the evening Chancellor Strong of the University of California went to each of the floors where the protesters were situated and announced that the building was closed, that anyone who wanted to leave the building was free to do so, and that those persons who remained would be guilty of unlawful assembly. This same announcement was subsequently made on each of the floors by Captain Beal of the Berkeley Police Department. The record is susceptible of the inference that each of appellants heard at least one of these announcements. Appellants, however, along with most of the protesters, remained inside the building. Subsequent to these announcements the Berkeley Police arrested a number of the protesters, including appellants. Each appellant, when told by the police that he was under arrest, ''went limp'' and had to be carried or dragged out of the building.

## Questions Presented

1. Did the probation department abuse or fail to exercise its discretion in commencing these proceedings against appellants?

2. Were appellants denied the effective aid of counsel?

3. Does the evidence support the trial court's finding that appellants violated Penal Code, section 602, subdivision (o)?

4. Does the evidence support the trial court's finding that appellants violated Penal Code section 409?

5. Does the evidence support the trial court's finding that appellants violated Penal Code section 148?

6. Were appellants' constitutional rights infringed upon in any way by holding them legally answerable for violations of Penal Code sections 602, subdivision (o), 409, and 148?

7. Was it an abuse of discretion, outside the power of the trial court, or in violation of appellants' constitutional rights, to require appellants, as a condition of probation, to spend four weekends (which could be reduced to two at the discretion of the probation officer) at the Training Academy of the probation department?

### The Propriety of the Juvenile Court Proceedings[2]

Appellants' first contention is that the probation department either failed to exercise any discretion at all or clearly abused its discretion in commencing proceedings in the juvenile court against appellants. Specifically, appellants urge that the probation department failed to make the preliminary investigation called for by section 652.[3] In regard to this contention, the record reveals that Deputy Probation Officer Haubrock, before filing petitions on appellants Howard and Dinaburg, discussed the alleged charges with Howard for about one-half hour and talked to Howard's parents, but did not talk with Dinaburg or with his family or friends or investigate Dinaburg's personal background; that Haubrock discussed the cases involving Howard and Dinaburg with his supervisor; and that Deputy Probation Officer Conley interviewed Bacon before filing a petition on him, reviewed the police report, discussed the matter with his supervisor, and concluded that a petition should be filed with respect to Bacon. The record in the Radey matter is silent as to the nature and extent of the investigation made by the probation department before it decided to commence proceedings against him.

Appellants Bacon, Howard and Dinaburg moved to dismiss the petitions on the ground that the probation department had not made the proper investigation prior to filing the petitions. The trial court denied the motion on the basis that the department had in fact exercised discretion. No such motion was made in the Radey proceeding.

In *In re Peterson*, 56 Cal.App.2d 791 [133 P.2d 831], the appellate court was called upon to interpret the meaning of section 721, which section was the predecessor of section 652

---

[2]Throughout our discussion of this and the following issue all statutory references are to the Welfare and Institutions Code.

[3]Section 652 provides that: "Whenever the probation officer has cause to believe that there was or is within the county, or residing therein, a person within the provisions of Sections 600, 601 or 602, the probation officer shall immediately make such investigation as he deems necessary to determine whether proceedings in the juvenile court should be commenced."

and provided that prior to filing a petition in the juvenile court "the probation officer . . . shall make such investigation as he deems necessary. . . ." In holding that it was not mandatory under section 721 for the probation officer to make an investigation in every case before filing a petition, the reviewing court stated as follows: "He is required to make only 'such investigation as he deems necessary,' which vests a discretion in him to make or not to make an investigation in certain cases. If he failed to make an investigation in this case we must presume that he was exercising the discretion given him under the statute." (P. 794.) This holding was followed in *In re Staser,* 84 Cal.App.2d 746 [191 P.2d 791], wherein it was also held that it must be presumed from the fact that the probation officer filed a petition, even though unverified, that she investigated the facts and approved the filing of the charges.

In the light of the holding in these cases, we conclude that the probation department could, in the instant cases, commence these proceedings against appellants without making a preliminary investigation. The record discloses, moreover, that in the cases of Howard, Dinaburg and Bacon an investigation was in fact made. Although Haubrock did not talk to anyone other than his supervisor concerning Dinaburg, he did testify that he was in possession of "the same information" with respect to the "other boys." Regarding Radey we note that Haubrock was also the petitioner in that case. In the face of the silent record as to Radey the subject contention, although joined in by him in his brief, was not urged at oral argument. While this contention was not expressly abandoned by Radey, it suffices to say that in his case, as well as in the cases of the other appellants, the petition by Haubrock was verified and alleged essentially the facts we have hereinabove set forth in the statement of facts. Under the circumstances we are entitled to presume that Haubrock investigated the facts and approved the filing of the charges.

### Effectiveness of Counsel

As a second contention appellants argue that their right to counsel was rendered ineffective. More specifically, appellants assert that prior to the hearings in these cases their counsel were given to understand by members of the probation department that a favorable recommendation on disposition would be highly unlikely if appellants refused to cooperate with the probation officers and the court; and that appellants' attorneys chose to cooperate with the probation

department and with the court, thereby allowing the substantive elements of the offenses constituting the jurisdictional facts to be elicited from appellants' testimony rather than from independent evidence. Accordingly, appellants claim that they were denied the effective right to counsel because their attorneys were "placed in the ambivalent position of being simultaneously the minor's representative and an agent of the court in promoting its philosophy of cooperation. . . ."

We find nothing in the record before us to support the claimed activity on the part of the probation department. We are of the opinion, however, that, even assuming such activity, the contention is nevertheless without merit. ■ While it is true that the right to be represented by counsel of his own choice has been afforded to a minor who appears before the juvenile court (§§ 679 and 700), the nature of this right must be viewed in context with the nature of the juvenile court system itself. A proceeding in the juvenile court is not a criminal proceeding. (§ 503.) It is instead in the nature of a guardianship. (*In re Schubert*, 153 Cal.App.2d 138, 141 [313 P.2d 968].) Moreover, section 680 specifically provides that "Except where there is a contested issue of fact or law, the proceedings shall be conducted in an informal nonadversary atmosphere with a view to obtaining the maximum cooperation of the minor upon whose behalf the petition is brought. . . ." In *In re Mikkelsen*, 226 Cal.App.2d 467, 470-471 [38 Cal.Rptr. 106], Justice Taylor, discussing the Juvenile Court Law, enacted in 1961, in relation to due process in juvenile proceedings, stated as follows: "The statute attempts to attain a hard working balance between preserving a guaranty of civil due process to the minor while retaining that informal court atmosphere which minimizes the proceedings' harmful effects and encourages the minor's receptivity to treatment."

■ In the instant case the juvenile court judge demonstrated a conscientious appreciation of the extent to which the juvenile proceedings become adversary. The record discloses that appellants were carefully advised of their rights, including the right to counsel, before their interviews with probation authorities. At the hearing before the juvenile court they were represented by able counsel who were afforded the right to cross-examine witnesses and to present their case as in any adversary proceeding. In sum, there is nothing in the record to indicate that appellants' representation by their counsel

was impinged upon so as to result in a deprivation of rights which could be said to be violative of due process.

### Penal Code Section 602, Subdivision (o)[4]

Appellants urge that for several reasons the evidence is insufficient to sustain the finding of the court that they violated the provisions of section 602, subdivision (o), which provides as follows: "Every person who willfully commits any trespass by . . . : (o) Refusing or failing to leave a public building of a public agency during those hours of the day or night when the building is regularly closed to the public upon being requested to do so by a regularly employed guard, watchman, or custodian of the public agency owning or maintaining the building or property, if the surrounding circumstances are such as to indicate to a reasonable man that such person has no apparent lawful business to pursue; is guilty of a misdemeanor." This contention, as well as all others made by appellants with respect to the insufficiency of evidence to sustain findings, must be viewed in the light of the prevailing canons of appellate review that a reviewing court must indulge in all reasonable inferences to support the findings of the juvenile court, and that such findings will not be disturbed on appeal when there is substantial evidence to support them. (*In re Schubert, supra*, 153 Cal.App.2d 138, 143; *In re Corrigan*, 134 Cal.App.2d 751, 754-755 [286 P.2d 32].) Before proceeding to discuss appellants' subject contention we should point out, with respect to the construction of the Penal Code, that section 4 thereof provides that the rule of the common law that penal statutes are to be strictly construed has no application but that their provisions "are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." (See *People* v. *Black*, 45 Cal.App.2d 87, 94 [113 P.2d 746]; *People* v. *Lovelace*, 97 Cal.App. 228, 230 [275 P. 489].)

 We need not dwell upon the first basis of appellants' contention in relation to section 602, subdivision (o)—namely that the subject section was not intended to apply to a "sit-in case"—since it is obvious from a reading of the section that the conduct described in the foregoing narrative of facts is clearly encompassed within the proscription of the statute. The assertion that Sproul Hall is not "a public building of a public agency" is similarly

---

[4]Unless otherwise indicated all statutory references contained in our discussion of this issue and the following three issues are to the Penal Code.

without merit. We judicially notice the fact of common knowledge that Sproul Hall is one of the complex of buildings located on the campus of the University of California at Berkeley. The establishment of the University of California is provided for by article IX, section 9, of the California Constitution which describes it as ''a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' . . .'' The adjective ''public'' is defined as ''Pertaining to a . . . whole community; . . . or affecting the whole body of people. . . .'' (Black's Law Dict. (4th ed. 1951); see *Duskin* v. *State Board of Dry Cleaners*, 58 Cal.2d 155, 163 [23 Cal.Rptr. 404, 373 P.2d 468].) Black defines a ''public building'' as ''One of which the possession and use, as well as the property in it, are in the public.'' In *Estate of Royer*, 123 Cal. 614, 621 [56 P. 461, 44 L.R.A. 364], the Supreme Court described the University of California as a ''public corporation'' and stated ''all its property is property of the state.'' And in *Newmarker* v. *Regents of University of Cal.*, 160 Cal.App.2d 640, 645-646 [325 P.2d 558], the appellate court, speaking of the nature of the Board of Regents, stated that ''common sense and the weight of authority indicate that the board of regents is a public legal entity charged with the government of a public trust. [Citations.]'' In the light of these authorities it is but to cavil to urge that Sproul Hall is not a public building and that the regents who administer and operate it are not a ''public agency.''

Appellants assert, also, that they were not in violation of the statute because they had ''lawful business'' to pursue in Sproul Hall. Assuming *arguendo* that entering Sproul Hall while it was regularly open to the public for the purpose of expressing to the administration certain grievances with university rules was a lawful business, we are of the opinion that that business ceased when the building became regularly closed and those persons to whom the grievances were addressed were entitled to cease their active school duties and responsibilities for the day. The circumstances in the instant case are not such as to indicate to a reasonable man that administrators of the university were required to keep Sproul Hall open beyond the regular 7 p.m. closing time in order that the stated grievances might be expressed in the manner chosen by the protesters.[5] Moreover,

---

[5] It should be here noted that one of appellants testified that the purpose of the protesters was ''in some way stopping the temporary function of the University.''

48

the record amply discloses that the grievances had been clearly and vocally made known to those to whom they were directed during the hours Sproul Hall was open to the public.

Equally unconvincing are appellants' arguments that they were not properly requested to leave the building. ██ We are satisfied that a reasonable interpretation of section 602, subdivision (o), does not require that each person inside the building be personally requested to leave. A blanket request such as that made here over the public address system sufficed, particularly since in the instant case each of appellants heard the request to leave at least once. ██ Moreover, the request to leave made by Chancellor Strong and by an officer of the Berkeley Police Department complied substantially with the requirements of the statute. The term "custodian" is intended to mean whoever might be in charge of the building at the time. The evidence indicates that Chancellor Strong assumed responsibility for the building, and it is reasonable to assume from all of the circumstances that the police were called to assist him in the discharge of his duties as such custodian. There can be no question but that appellants were given a fair and adequate notice to leave the premises.

### Section 409

██ Appellants challenge the sufficiency of the evidence to sustain a finding that they violated section 409, which provides as follows: "Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor." They urge that this section does not apply to "sit-in" cases; that they were not "present at the place of any riot, rout, or unlawful assembly"; and that they were not "lawfully warned to disperse; . . ." We conclude that there is no merit in any of these contentions.

As to the first of these contentions we reiterate what we have stated with regard to the applicability of section 602 to the type of activity described as a "sit-in." There can be little doubt that section 409, by its fair import, can encompass under applicable circumstances activity which consists in the occupying of an area, place or establishment for the purpose of an organized protest against some grievance.

As to the particular applicability of section 409 to the facts in the instant case, we note, initially, that the petitions against appellants charged them only with being present at an unlawful assembly. Section 407 defines an unlawful assembly as follows: ''Whenever two or more persons assemble together to do an unlawful act, and separate without doing or advancing toward it, or do a lawful act in a violent, boisterous, or tumultuous manner, such assembly is an unlawful assembly.'' Appellants were not charged with violating section 408, which makes it a misdemeanor to participate in an unlawful assembly. ██ Section 409 is distinguished from section 408 in that the offense proscribed by the former is committed when a person remains at the place of assembly after he has lawfully been warned to disperse, even though he may not have participated in the assembly. (See *People* v. *Anderson*, 117 Cal.App.Supp. 763, 769 [1 P.2d 64].)

The record does not support a conclusion that appellants were assembled to ''do a lawful act in a violent, boisterous, or tumultuous manner. . . .'' Accordingly, the charge against appellants can only be sustained if each assembled together with one or more persons ''to do an unlawful act, and separate[d] without doing or advancing toward it. . . .'' In the instant case there is ample evidence to sustain a finding that a number of the protesters who had entered Sproul Hall chose to remain therein and to assemble together in a ''sit-in'' activity after the building was closed and after they were ordered to leave. Such activity, as already pointed out, was in violation of section 602, subdivision (o). We thus have a situation where two or more persons assembled to do an unlawful act. The question remains whether this assembly was unlawful since section 407 appears to provide that in addition to an assembly for the purpose of doing an unlawful act there must also be a separation of the persons assembling without doing or advancing toward the unlawful act. In the instant case there was no such separation on the part of the protesters who remained in Sproul Hall. In fact they proceeded to do the unlawful act and remained assembled there during the night, becoming separated only when arrested on the morning of the following day.

The apparent requirement of section 407 that, before there can be an unlawful assembly, the persons who have assembled to do an unlawful act must separate without doing or advancing toward it is not the interpretation placed on the statute by our Supreme Court in *Coverstone* v. *Davies*, 38

Cal.2d 315 [239 P.2d 876]. In that case it was held that assembling for an illegal purpose renders the action of the group knowingly participating therein an unlawful assembly within the meaning of section 407. There a group of students had gathered together for the purpose of viewing a "hot-rod" race, an activity forbidden by law. In the light of this interpretation an unlawful assembly occurred in the instant case when the group of protesters knowingly remained in Sproul Hall after it became closed to the public and after having been requested to leave by the custodian of the building. The record is clear that appellants were present at the place of the unlawful assembly. Accordingly, if they did not disperse after the assembly was lawfully warned to disperse, appellants were in violation of section 409 even though they may not have participated in the assembly.

Appellants, citing the case of *People* v. *Kerrick*, 86 Cal. App. 542 [261 P. 756], urge that section 407 applies only to breaches of public peace and that the public peace was not breached in the instant case. As we read *Kerrick*, however, it was concerned with the second portion of section 407, namely, the doing of a lawful act in a violent, boisterous, or tumultuous manner. This case thus does not furnish authority for appellants' contention that section 407 applies only to situations involving a breach of the public peace.

Appellants' final contention as to the applicability of section 409 to the facts of the instant case is that they were not lawfully warned to disperse. Although section 409 does not specify the manner in which the persons assembled must be asked to disperse, the case of *People* v. *Sklar*, 111 Cal.App. Supp. 776 [292 P. 1068], held that this gap was filled by section 726, which provides as follows: "Where any number of persons, whether armed or not, are unlawfully riotously assembled, the sheriff of the county and his deputies, the officials governing the town or city, or the judges of the justice courts and constables thereof, or any of them, must go among the persons assembled, or as near to them as possible, and command them, in the name of the people of the State, immediately to disperse." *Sklar* also interpreted this section as including police officers among those persons empowered to give the command to disperse. Additionally, *Sklar* noted that "Under our code section no particular form of proclamation is required, but the section does require that something in the nature of a general command to disperse be given and that it purport to be in the name of the people of the state." (P. 779.)

Whether section 726, which by its terms purports to deal with riotous situations, would be applicable to the facts in the instant case or whether, on the other hand, an effective command to disperse could have taken any reasonable form, it is apparent that appellants were fairly and adequately notified that they should leave Sproul Hall. Not only did Chancellor Strong give a command to disperse, but also a Captain of the Berkeley Police Department went from floor to floor in the building and announced over a portable loudspeaker that the persons gathered in the building were participating in an unlawful assembly, that they were free to leave the building, but that those who remained would be arrested for trespass.

### Section 148

Appellants contend that the evidence was insufficient to show a violation of section 148, which provides as follows: "Every person who wilfully resists, delays, or obstructs any public officer, in the discharge or attempt to discharge any duty of his office, when no other punishment is prescribed, is punishable by a fine not exceeding one thousand dollars, or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment."

▪▪▪▪ Appellants argue that their conduct in going limp and relaxing their extremities did not constitute resistance, delay or obstruction within the meaning of section 148. We are unaware of any California case, nor has any been cited to us, which deals with whether the conduct in question constitutes a violation of section 148. In the New York case of *People* v. *Knight,* 35 Misc.2d 216 [228 N.Y.S.2d 981], a statute defining the subject crime in language similar to that of section 148 was held to include passive resistance. There the defendant upon being placed under arrest, pulled the arresting officer's hand off his shoulder, ran into the crowd on the sidewalk, lay down on the sidewalk and refused to move. The Magistrate's Court of the City of New York in discussing this and companion cases stated as follows: "[T]hese defendants wilfully engaged in resisting police officers who were properly exercising their duties. Passive resistance is nevertheless resistance. To interfere and obstruct and delay within Penal Law, Section 1851 does not and need not require active resistance and force by the defendants." (P. 987 [228 N.Y.S.2d].) In *State* v. *Merrifield,* 180 Kan. 267 [303 P.2d 155], a conviction for resisting arrest was upheld where the defendant, after having been placed

under arrest, went into his house and closed and locked the door.

In support of their contention appellants call attention to section 834a which provides that "If a person has knowledge, or by the exercise of reasonable care, should have knowledge, that he is being arrested by a peace officer, it is the duty of such person to refrain from using force or any weapon to resist such arrest." They urge that this statute indicates that as long as a person arrested does not use force or any weapon to resist arrest, he is under no duty to cooperate actively in being taken to jail. ▆ Before proceeding to discuss this section, it should be noted that it has always been the law of this state that it is the duty of every citizen to submit to *lawful* arrest. (*People* v. *Spinosa,* 115 Cal. App.2d 659, 664 [252 P.2d 409]; *People* v. *Hardwick,* 204 Cal. 582, 584-588 [269 P. 427, 59 A.L.R. 1480]; 5 Cal.Jur.2d, Arrest, § 30, p. 186.) Accordingly, where the arrest is lawful, the offense of resisting an officer can be committed without the employment of actual violence or direct force. (48 A.L.R. 749; *People* v. *Brooks,* 131 Cal. 311, 315 [63 P. 464]; *United States* v. *McDonald* (1879) 8 Biss. 439 [26 F. Cas. No. 15,667]; *Reed* v. *State,* 103 Ark. 391 [147 S.W. 76, Ann.Cas. 1914B 811]; *People* v. *King,* 236 Mich. 405 [210 N.W. 235, 48 A.L.R. 742]; *Despard* v. *Wilcox* (1910) 102 L.T.R. (N.S.) (Eng.) 103. This rule is particularly applicable under statutes containing the words " 'resist, obstruct, or abuse' " or the single word " 'resist' . . ." (48 A.L.R., *supra.*) In *Brooks,* it was stated that a person who flees from an officer attempting to arrest him may be found guilty of resisting arrest. The *McDonald* case construed a statute containing the descriptive words " 'obstructs, resists or opposes'. . . ." (P. 1074 [26 F.Cas.].) The court said: "The statute, however, does not limit the offense to resistance alone, it includes also willful acts of obstruction or opposition; and to obstruct is to interpose obstacles or impediments, to hinder, impede or in any manner interrupt or prevent, and this term does not necessarily imply the employment of direct force, or the exercise of direct means. It includes any passive, indirect or circuitous impediments to the service or execution of process; . . ." (P. 1077 [26 F.Cas.].)

▆ Although section 834a clearly requires that a person who is being arrested refrain from using force, whether the arrest is lawful or unlawful (*People* v. *Burns,* 198 Cal. App.2d Supp. 839, 841 [18 Cal.Rptr. 921]), it is apparent that this section was enacted by the Legislature in 1957 to do

away with the former rule that a person could use reasonable force to resist an *unlawful* arrest. (*People* v. *Burns, supra,* p. 841; as to former rule see *People* v. *Spinosa, supra,* p. 664; 5 Cal.Jur.2d, *supra.*) ''The former rule inevitably led to riots and violence by fostering a belief on the part of many people that they were the sole judges as to whether their arrest was or was not proper.'' (*People* v. *Burns, supra,* p. 841.) Accordingly, section 834a was enacted to eliminate the right of a person *improperly* arrested to use force at the time of arrest and to require him to seek his redress by resort to the courts, that is, by pursuing his lawful remedies against the peace officer, rather than by resort to violence. (*People* v. *Burns, supra,* p. 841.)

In the instant case, since appellants were lawfully arrested, we need not decide whether, in view of the enactment of section 834a, a person unlawfully arrested may passively resist arrest. The present case is controlled by the principles hereinbefore discussed to the effect that where the arrest is lawful a person arrested may not use passive resistance or interpose any obstacles which in any manner impede, hinder, interrupt, prevent or delay such arrest. We hold, therefore, that a person who goes limp and thereby requires the arresting officer to drag or bodily lift and carry him in order to effect his arrest causes such a delay and obstruction to a lawful arrest as to constitute the offense of resisting an officer as defined in section 148.

The second argument which appellants make in conjunction with section 148 is that they could not commit a violation of that section because their conduct in resisting, delaying or obstructing the police was the same conduct which formed the basis of the section 602, subdivision (o), and section 409 charges against them. Accordingly, appellants argue that there was ''another punishment'' prescribed for their conduct. No case has come to our attention which defines the meaning of the language ''when no other punishment is prescribed'' contained in section 148. The reasonable interpretation of that language is, however, that where no other punishment is otherwise provided for by statute for conduct which amounts to willfully resisting, delaying, or obstructing a public officer in the discharge of his duties, such conduct is to be punished as provided in section 148.

Suffice it to say, in the instant cases the offenses encompassed by sections 602, subdivision (o), and 409 were separate and distinct offenses which had been completed prior to the time appellants were placed under arrest. (See

*People* v. *Wilson*, 224 Cal.App.2d 738, 741-742 [37 Cal.Rptr. 42].) Accordingly, the punishments prescribed therefor are not the same as the punishment specifically prescribed for their conduct in resisting arrest.

Appellants' final contention with regard to section 148 is that the Berkeley police officers who arrested appellants were not "public officers" within the meaning of this section because they were acting beyond the boundaries of their jurisdiction. (See *People* v. *Martin*. 225 Cal.App.2d 91, 94 [36 Cal.Rptr. 924].) This court may take judicial notice that Sproul Hall is located within the Berkeley city limits. (See *People* v. *Hosney*, 204 Cal.App.2d 584, 587 [22 Cal. Rptr. 397].) By virtue of sections 34313 and 34314 of the Government Code, Sproul Hall is part of the city even though it is situated on land not subject to taxation. Therefore, because it is part of the City of Berkeley, the campus of the University of California is within the jurisdiction of the Berkeley Police Department.

Section 23501 of the Education Code relied on by appellants does not compel a different conclusion. As appellants recognize, that section merely authorizes the regents to establish a police department for the university. It does not vest that department with sole police jurisdiction over the campus. Appellants contend, however, that the regents, by internal regulations, have conferred upon the campus police exclusive jurisdiction. However, the law is clear that an administrative regulation may not take precedence over laws passed by the Legislature under its general police power. (*Tolman* v. *Underhill*, 39 Cal.2d 708, 712 [249 P.2d 280]; *Wallace* v. *Regents of University of Cal.*, 75 Cal.App. 274, 278 [242 P. 892]; *Williams* v. *Wheeler*, 23 Cal.App. 619, 625 [138 P. 937].) Thus, the Board of Regents in setting up the campus police department, could only grant it a jurisdiction over the campus which would be concurrent with that of the Berkeley Police Department. It is not uncommon for more than one law enforcement agency to have jurisdiction in the same geographical area. (See 43 Ops. Cal. Atty. Gen. 246; 8 Ops. Cal. Atty. Gen. 149.) Accordingly, it is to be concluded that members of the Berkeley Police Department were in fact acting as public officers within the meaning of section 148.[6]

---

[6]Officer Lawrence Mulvey of the Berkeley Police Department testified that his department had concurrent jurisdiction over the campus with the university police. He stated that it was the practice of the Berkeley

In sum we hold that since appellants committed the acts proscribed by sections 602, subdivision (o), and 409 in the presence of Berkeley police officers (§ 836, subd. 1) they were lawfully arrested. Accordingly, by their conduct in "going limp" appellants willfully resisted, delayed and obstructed these officers in the discharge of their duties.

### Appellants' Constitutional Rights

Appellants next urge that the subject statutes were unconstitutional on their face and as applied. Specifically appellants assert that the statutes under which they were arrested and which they were held to have violated are so vague as to be in violation of the due process clause of the Fourteenth Amendment of the United States Constitution and article I, section 13 of the California Constitution, and that these same statutes deprive all persons, including appellants, of their rights to free speech, press, assembly and petition for redress of grievances under the First and Fourteenth Amendments to the United States Constitution and article I, sections 1, 9, and 10 of the California Constitution.

We consider first the argument relating to the unconstitutionality of sections 602, subdivision (o), 409, and 148 on the ground of vagueness. Under the Fourteenth Amendment to the United States Constitution and article I, section 13 of the California Constitution, a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. (See *Connally* v. *General Constr. Co.*, 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322] ; *Lanzetta* v. *New Jersey,* 306 U.S. 451, 453 [50 S.Ct. 618, 83 L.Ed. 888] ; *In re Newbern,* 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116] ; *People* v. *McCaughan,* 49 Cal.2d 409, 414 [317 P.2d 974] ; *Winters* v. *People of State of New York,* 333 U.S. 507, 509-510 [68 S.Ct. 665, 92 L.Ed. 840].) Section 602, subdivision (o), is simply a trespass law intended to preserve the security of public buildings during hours when such buildings are regularly closed against individuals who remain therein without any lawful purpose. The section clearly sets forth the type of conduct which is forbidden and specifically describes the

Police Department to render assistance to the campus police department when requested to do so, and that he had personally participated in a number of arrests on the campus.

nature of the required warning to leave. In *Edwards* v. *South Carolina,* 372 U.S. 229 [83 S.Ct. 680, 9 L.Ed.2d 697], an analogous statute regulating the use of public buildings was approved by the United States Supreme Court. Here, section 409, in declaring it unlawful to remain at the scene of a riot, rout or unlawful assembly after a warning to disperse, uses language which is clear and unambiguous. This section has been held to be *in pari materia* with section 726 which lists the officers who are authorized to give the command to disperse. (*People* v. *Sklar, supra,* 111 Cal.App.Supp. 776, 778.) While this latter section does not expressly include police officers, it has been held by the cases to include the police. (*People* v. *Sklar, supra,* p. 778.) These statutes find their origin in the English statute of I Geo. I, statute 2, chapter 5 (1714), commonly referred to as " 'reading the riot act,' " which has been the model for similar laws adopted by various states of this country. (See *People* v. *Sklar, supra,* p. 779.) With regard to section 148, it too prohibits a particular type of conduct in clear and precise language. Similar language has been approved by the United States Supreme Court as "a precise, narrowly drawn regulatory statute which proscribes certain specific behavior." (*Cox* v. *Louisiana,* 379 U.S. 559, 562 [85 S.Ct. 466, 476, 13 L.Ed.2d 487].) We accordingly conclude that sections 602, subdivision (o), 409 and 148 are sufficiently definite in their terms so that a person of ordinary understanding would know when he is violating their provisions.

As to appellants' contention that these statutes deprived them of their rights of free speech, assembly and petition for redress of grievances, appellants rely heavily on *Cox* v. *Louisiana,* 379 U.S. 536 [85 S.Ct. 453, 13 L.Ed.2d 471], and *Cox* v. *Louisiana, supra,* 379 U.S. 559. Those cases involved the same factual situation.[7] Cox led a group of students in a protest parade through the streets of Baton Rouge to the courthouse during business hours. The students received permission from the police officers present to stage a demonstration across the street from the courthouse. The demonstration obstructed the sidewalk but was orderly. Subsequently Cox was arrested, charged, and convicted for violating Louisiana statutes forbidding disturbing the peace, obstructing public passages, and picketing before a courthouse. The United

---

[7]The first case deals with the applicability of a Louisiana statute dealing with breach of the peace and obstructing public passages; the second with a Louisiana statute forbidding picketing and parading in or near a courthouse.

States Supreme Court reversed all three convictions on the following bases: (1) The court held that the breach of peace statute, as interpreted by the Louisiana Supreme Court, was unconstitutionally broad in scope and placed undue limitations on the exercise of First Amendment liberties;[8] (2) the court found that the statute prohibiting all street assemblies and parades had been enforced selectively by Baton Rouge officials and held that the "unfettered discretion" they exercised was an "unwarranted abridgment" of the defendant's freedom of speech and assembly, even though the sidewalk had been obstructed; and (3) the court, although holding that a state statute which forbids picketing or parading in or near a courthouse with the intent to influence the administration of justice does not infringe upon the constitutionally protected rights of free speech, nevertheless found that the police had given permission for the demonstration to be staged across from the courthouse and therefore held that, even though this permission had subsequently been revoked, the demonstrators were justified in tending to rely on this administrative interpretation of how "near" the courthouse a demonstration could lawfully take place.

As regards the instant case, we do not have the situations covered by the second and third portions of the Supreme Court's holding in *Cox*. Although it is true that University of California students had, for several days prior to December 2, 1964, registered protests with the administration concerning its policy of free speech and assembly on the campus, there is no evidence that these previous protests had taken any illegal form, or that the university administration had made any representations to the student protesters that their conduct of December 2 and 3, 1964 would be sanctioned, or, finally, that the statutes under which appellants were arrested had been enforced selectively by the Berkeley Police Department.

Notwithstanding the holdings in *Cox* on the basis of the particular constitutional implications of the statutes there involved, appellants' reliance upon *Cox*, insofar as it pertains to alleged violations of the constitutional rights asserted by them in the instant cases, is misplaced. Justice Goldberg, writing for the majority, stated as follows: "The

[8]This statute was held to be unconstitutionally vague because it would allow persons to be punished merely for peacefully expressing unpopular views. Moreover, the Supreme Court concluded that the record did not show any conduct which constituted a breach of the peace.

rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.'' (P. 554.) ''Nothing we have said here or in No. 24, *ante* [379 U.S. 536], is to be interpreted as sanctioning riotous conduct in any form or demonstrations, however peaceful their conduct or commendable their motives, which conflict with properly drawn statutes and ordinances designed to promote law and order, protect the community against disorder, regulate traffic, safeguard legitimate interests in private and public property, or protect the administration of justice and other essential governmental functions. Liberty can only be exercised in a system of law which safeguards order. We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society. We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations.'' (P. 574.)

In the light of the principles declared in *Cox*, and the many decisions therein cited, we are led to the conclusion that although appellants undoubtedly possessed the constitutional right to express their grievances, these constitutional rights did not abrogate appellants' duty to refrain from violating laws of our state which are clear as to the conduct which they prohibit, which reasonably provide for the protection of the public and of public property and which were not arbitrarily applied by the authorities.

### The Conditions of Probation[9]

Appellants urge, finally, that the ''Imposition of weekend incarceration at manual labor violated juvenile court law and

[9] All statutory references in the discussion of this issue are to the Welfare and Institutions Code.

the California and United States Constitution.'' Although
the orders placing appellants on probation without wardship
merely state that they were to ''spend four weekends'' at
the probation department's ''Training Academy,'' this con-
tention is apparently predicated upon the oral remarks which
the trial judge made at the time he announced his decision,
these remarks being as follows: the ''best thing would be to
permit you to work for the county a couple of week-ends''
and ''The kinds of work you'll do will probably be cleaning
up old and historic cemetery lots.''

Considering first the aspect of appellants' contention
relating to the juvenile court law, we note that section 725
provides as follows: ''(a) If the court has found that the
minor is a person described by sections 601 or 602, it may,
without adjudging such minor a ward of the court, place, the
minor on probation, under the supervision of the probation
officer, for a period not to exceed six months. (b) If the court
has found that the minor is a person described by sections
601 or 602, it may order and adjudge the minor to be a ward
of the court. . . .'' We also note the following pertinent provi-
sions of section 726 : ''In all cases wherein a minor is adjudged
a ward . . . of the court, the court may limit the control to be
exercised over such ward . . . by any parent or guardian and
shall by its order clearly and specifically set forth all such
limitations, but no ward . . . shall be taken from the physical
custody of a parent or guardian unless upon the hearing the
court finds one of the following facts: . . .''[10] In *In re
Batey,* 183 Cal.App.2d 78 [6 Cal.Rptr. 655], it was held
that an order declaring a minor a ward of the juvenile
court and detaining him in juvenile hall for 10 days could
not be made unless the court made a specific finding of
one of the particular facts designated in section 726 (for-
merly § 739).

It is apparent that even where a minor is made a ward of
the court such a minor may not be taken from the physical
custody of a parent or guardian unless the court finds one of
the facts specified in section 726. In the instant case the court
did not adjudge any of appellants to be a ward of the
court. Accordingly, reading sections 725 and 726 in

[10]These facts are stated as follows in section 726: ''(a) That the
parent or guardian is incapable of providing or has failed or neglected
to provide proper maintenance, training, and education for the minor.
(b) That the minor has been tried on probation in such custody and has
failed to reform. (c) That the welfare of the minor requires that his
custody be taken from his parent or guardian.''

60

relation to each other, we conclude that where a minor is not made a ward of the court in cases where he is found to be a person described by sections 601 or 602, the court is limited, under the provisions of section 725, subdivision (a), to an order placing the minor on probation, under the supervision of the probation officer, for a period not to exceed six months. In placing a minor on probation under the supervision of the probation officer "a court undoubtedly may impose such terms as will bring home to the minor a realization of the seriousness of his delinquency." (*In re Trignani*, 148 Pa. Super. 142 [24 A.2d 743, 744].) Moreover, in imposing conditions of probation, the court is vested with a broad discretion in order to best serve the interests of the minors within its jurisdiction and its exercise of that discretion will not be disturbed in the absence of a manifest abuse of discretion. (*In re Walker,* 159 Cal.App.2d 463, 467-468 [324 P.2d 32]; *In re Schubert, supra,* 153 Cal.App.2d 138, 143.)

In the instant cases appellants do not take issue with the terms of probation other than that requiring them to spend four weekends at the Training Academy. Our immediate inquiry, accordingly, is whether this requirement deprives appellants' parents of the physical custody of appellants during such time as they are in attendance at the academy. Were we to interpret the trial court's order as requiring appellants to be detained continuously during each weekend period we would be constrained to conclude that such detention amounts to a deprivation of physical custody and that, therefore, the court abused its discretion since it does not have the power to deprive a parent of the physical custody of a minor where the minor is not made a ward of the court. However, as already indicated, the orders, in the instant cases, merely state that the respective appellants are to "spend four weekends at Training Academy. . . ." There is nothing in the record to disclose the nature of the activities conducted at the academy except the judge's statement that appellants are to perform some type of work while there; nor does the record disclose the length of time to be spent by appellants at the academy on each of the weekends except for the fact that in the Howard, Dinaburg and Bacon cases the judge stated at the time he imposed the conditions of probation that "This program is from eight to five on Saturday and Sunday. I suppose."

 The interpretation of an order or judgment, insofar as its meaning is concerned, is governed by the same rules

which apply in ascertaining the meaning of any other writing. (*Colvig* v. *RKO General, Inc.*, 232 Cal.App.2d 56, 65 [42 Cal.Rptr. 473]; *Estate of Careaga*, 61 Cal.2d 471, 475 [39 Cal.Rptr. 215, 393 P.2d 415]; *Los Angeles Local etc. Board* v. *Stan's Drive-Ins, Inc.*, 136 Cal.App.2d 89, 94 [288 P.2d 286].) "Where an ambiguity exists, 'The rule with respect to orders and judgments is that the entire record may be examined to determine their scope and effect. . . .' " (*Estate of Careaga, supra*, p. 475; *Los Angeles Local etc. Board* v. *Stan's Drive-Ins, Inc., supra*, p. 94.) As regards the subject orders it is apparent that the intended meaning is uncertain. We therefore resort to the record to resolve the ambiguity.

The remarks of the trial judge at the time he imposd the conditions of probation in the cases of Howard, Dinaburg and Bacon indicate that he intended that these appellants attend the Training Academy during the daytime on the specified Saturdays and Sundays and that they then return to their homes at the conclusion of each day's attendance. We so interpret the orders in these cases. Consonant with this interpretation we hold that attendance at the academy during the daytime is not a deprivation of physical custody but is akin to a temporary absence from parental control as in the case of school attendance. In reaching this conclusion we are persuaded that a requirement that a minor report periodically to a probation officer or that he attend a specified school for a number of hours during a given day and for several days does not do violence to a parent's custodial rights involved in the physical care and control of the minor and embraced in the concept of "physical custody." (See *Burge* v. *City & County of San Francisco*, 41 Cal.2d 608, 618 [262 P.2d 6].)

 The subject remark was not made in the case of Radey; all that the trial judge said in that case was that Radey "spend four weekends commencing the week-end after this . . . in the Probation Department's Training Academy." However, since the trial judge was the same in all of the instant cases, and since the Radey case was decided subsequent to the others, it is reasonable to assume, in view of the fact that all of the cases arose out of the same incident and the same conditions of probation were imposed in each case, that the judge intended that the period of temporary detention be the same in all of the four cases which are the subject of this appeal.

Appellants also urge that this condition imposed upon their probation violated the United States and California Constitutions in that it constituted involuntary servitude (in violation of the Thirteenth Amendment to the United States Constitution and article I, section 18, of the California Constitution), and deprived appellants of substantive due process ("in that the punishment that was applied to them was not only irrational but also totally disproportionate to the alleged offenses"). Considering this contention we first note that "The provisions of the state and federal Constitutions relating to involuntary servitude do not have reference to the legitimate authority for the control and education of children, since a child may be subjected to restraints that may be necessary for his proper education and discipline that could not be applied to adults." (16 C.J.S., Constitutional Law, § 203(5), pp. 1001, 1004; see 60 A.L.R. 1325, 1342; and see *In re Santillanes,* 17 N.M. 140 [138 P.2d 503, 511]; *Garner* v. *Wood,* 188 Ga. 463 [4 S.E.2d 137, 139]; *Bryant* v. *Brown,* 151 Miss. 398 [118 So. 184, 60 A.L.R. 1325]; *Lindsay* v. *Lindsay,* 257 Ill. 328 [100 N.E. 892, Ann. Cas. 1914A 1222, 45 L.R.A. N.S. 908].) The rationale behind this principle is that a juvenile court proceeding is not a criminal proceeding but one in which the state exercises the inherent power as *parens patriae* to interfere, on behalf of the child, including such interference between the child and his parents, when the morals, safety or interests of the child require it. (*In re Santillanes, supra,* p. 512, and cases therein cited.) As stated in *Wisconsin Industrial School for Girls* v. *Clark County,* 103 Wis. 651 [79 N.W. 422, 427], in discussing the power to place children under restraint, "There is no restraint upon the natural liberty of children contemplated by such a law . . . ; but rather the placing of them under the natural restraint, so far as practicable. . . . The design is not punishment, nor the restraint imprisonment, any more than is the wholesome restraint which a parent exercises over his child."

 Adverting to the instant cases once again we cannot say that there is any substance to the contention that appellants will be subjected to manual labor so as to constitute either a violation of the constitutional proscriptions against involuntary servitude or the infliction of cruel or unusual punishment, notwithstanding the trial court's remarks that appellants would *"probably* be cleaning up old and historic cemetery lots." (Italics added.) As the record stands there

is nothing to indicate that appellants will be required to do any manual labor at all or that the program will consist of anything more than an educational program. Suffice it to say, the law provides for adequate safeguards to insure against the violation of constitutional rights. ▮▮ Nor can we say as a matter of law that the trial court abused its broad discretion in imposing the Training Academy attendance condition of probation since we cannot say that all reasonable minds will conclude that the subject condition is disproportionate to the offenses committed by appellants in view of the conclusion reached by us that the evidence is sufficient to sustain a violation of the three misdemeanor statutes hereinbefore discussed.

The respective orders are affirmed.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied March 2, 1966, and appellants' petition for a hearing by the Supreme Court was denied April 5, 1966.