Opinion
SMITH, J.*
The defendant in this case was arrested at the same time and place and for the same offense as the defendants in People v. Uptgraft (1970) Crim. A. No. 8603, ante, p. Supp.1 [87 Cal.Rptr. 459]. The record is different in many respects but we shall restate the facts only where the differences present different legal problems. The principal difference is that Captain Lembke did not testify and thus the convictions must be justified, if at all, upon the basis of the administrative order of acting President Oviatt. The latter is the problem which we expressly refrained from deciding in the Uptgraft case (although it would have been a proper basis for affirmance even though not the apparent basis for decision by the trial court). The Dr. Oviatt order, unlike the Captain Lembke order, does not depend upon there being sufficient evidence to justify a finding that those assembled on January 9th had assembled for the unlawful purpose of engaging in physical violence but instead depends upon whether *Supp. 23 Dr. Oviatt had sufficient information of acts prior to that meeting to justify an administrative order prohibiting all meetings, except classes, upon the campus. So far as any individual defendant was concerned, it was not necessary that he intended any violence but only that he remained (and had the general intent to remain) at the prohibited meeting after being warned to disperse.
Section 409 Penal Code is valid and has been interpreted in Uptgraft, supra, ante, p. Supp. 1, and In re Bacon (1966) 240 Cal.App.2d 34 [49 Cal.Rptr. 322]. Also see Coverstone v. Davies (1952) 38 Cal.2d 315 [239 P.2d 876] (which discusses Pen. Code, § 407 defining unlawful assembly). We shall decide merely whether it was properly applied to the facts before us.
Was the order of Dr. Oviatt a valid administrative order? Yes.
There is no dispute that the state laws involved create the Board of Trustees for State Colleges (Ed. Code, § 22600); authorize such boards to adopt rules and regulations not inconsistent with the laws of this state for the government of state colleges (Ed. Code, § 23604, subd. (c)); authorize establishment of rules and regulations for government and maintenance of college buildings and grounds, the violation of which is made a misdemeanor (Ed. Code, § 23604.1); and permit delegation of the board’s power to officers, employees and committees designated by the board (Ed. Code, § 23605).
The trustees did adopt regulations. At the time of the arrests these read in part as follows (see Exh. 4):
“1. The primary reason for the existence of the college is the educational process. Classes and other proper educational activities (as determined by the college) should be allowed to continue without disruption.
“2. The only environment within which the educational process can be successfully conducted is one of academic freedom. Such academic freedom shall not be construed to include actions which disrupt the educational process through the use of violent or coercive means.
“3. The president of each state college has the authority and the responsibility to do everything possible to prevent the disruption of the educational process. The president is expected to work with the faculty, the students, and the outside community to prevent the disruption of the educational process.
“4. In the event that disruption of the educational process threatens or occurs, the president shall use all means at his disposal, including *Supp. 24 police when necessary, to maintain or restore the normal educational process.”
Thus, appellant’s assertion that there were “no” regulations is wholly without merit. The fact that the trustees adopted more regulations after the disturbances merely indicates prudence and the determination to have the strongest possible regulations.
Based upon this authority and because of the violence which had occurred on the prior two days, and also in part because of a history of violence over a period of many weeks, acting President Oviatt issued an order early on the morning of January 9th reading as follows:

“Attention

“Students, Faculty, and Staff of Valley State College
“A state of emergency has been ordered by the acting president. This means only SFVSC students, faculty, and staff are authorized to be present on campus. Anyone who cannot present proper identification will be asked to leave the campus; unauthorized persons will be subject to arrest.
“During the emergency all demonstrations, assemblies, rallies, and meetings in the open forum or elsewhere, except for classes are prohibited. The meeting in the open forum for 12:00 noon today has been cancelled.
“This is an extreme situation precipitated by the events of the past few days. There has been a steady escalation of disruption of normal campus activity. In addition, information has been given to campus authorities that off-campus groups plan to disrupt the entire college and interfere with classes regardless of the risk to life and property. Such a threat cannot be ignored; at the same time students must be allowed to continue their education.
“Every effort is being made to satisfy legitimate grievances of all groups. We are seeking rapid solution to all grievances that can be satisfied by the college itself, but continued disruption can only impede further progress.
“We have, since the beginning of the college, maintained an environment for learning and dialogue. It now appears that there are groups who prefer coercion and confrontation to rational discussion. We hope to restore this normal functioning as soon as the threat to persons and property subsides.
“D. T. Oviatt
“Acting President
“January 9, 1969”
*Supp. 25 It was read over loud speakers from 8 a.m. to 9:15 a.m. and posted and distributed throughout the campus in written form.
Before making the order, Dr. Oviatt had concluded, based upon the facts above referred to, that “serious danger to persons and property existed and that the action upon which he then determined was necessary to protect lives and property, to establish a reasonable level of tranquility, and to permit college purposes to proceed.”
Under the circumstances, the administrative order was fully justified. Dr. Oviatt would have been derelict in his duty if he had not acted as he did. He could have closed the school completely as it was closed on January 6th. A fortiori, he could do the lesser thing, i.e., close the school except for classes. Under the circumstances and “during the emergency,” as provided in the order, it was quite proper to stop “all” meetings. Appellant seems to think that the order was inadvertently overbroad and that Dr. Oviatt prohibited more than he intended and that because of this, it was unconstitutional. We agree that the validity of an order is to be determined by what it prohibits, and not by a lesser set of acts which might properly have been prohibited if the order had been so limited, but we have no such problem here. Contrary to the opinion of appellant and construing the order as any reasonable person would construe it, it was not overbroad either as to duration or as to the kinds of meetings prohibited. In the emergency, it was not necessary to adopt an elaborate set of rules spelling out certain assemblies that could be held and certain that could not. That would have been necessary if the order had been adopted when there was no emergency and it had applied to meetings generally throughout the school year. But this was not such an order. An emergency existed. Even if there had been time to draft a long order, here it would have been impractical and inappropriate and confusing. Under the circumstances and for the duration of the emergency, any meeting might be the beginning of violence and was undesirable from the standpoint of proper school administration. We must keep in mind that the latter is the test and not whether the circumstances would justify police intervention irrespective of such an order. A school administrative order is usually adopted for reasons other than violence, and relates merely to what is best for the school. Dr. Oviatt was acting as a reasonable school administrator and made an order well within his authority (since he could have closed school altogether) and so explicit and simple that anyone who wanted to understand it could understand it. Also, any reasonable student would have understood that the prohibition was for the duration of the emergency only as it expressly stated, and would have known exactly what emergency was referred to.
*Supp. 26 The purpose of the order was to bring violence to an end. It did. Appellant tries to distort that into proof that the order was not needed. Any person familiar with the record before us would be very naive if he did not realize that there would have been violence that day if the order had not been made. Just because the order was successful does not prove it was not needed.
Appellant’s reliance on Supreme Court decisions to support his position is not well founded. He falls into the common error of choosing language from decisions which are factually different. We must distinguish 1) cases involving pure speech on defendant’s own property (owned or rented) or on public property primarily dedicated for assemblies and speeches and 2) cases involving either a) assemblies on property primarily dedicated for other purposes or b) speech coupled with acts which are subject to regulation. We have already discussed such distinction in Uptgraft, where we cited Cameron v. Johnson (1968) 390 U.S. 611 [20 L.Ed.2d 182, 88 S.Ct. 1335]; Adderley v. Florida (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242]; Cox v. Louisiana (1965) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453] and the companion case by the same name; Edwards v. South Carolina (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680]; Milk Wagon Drivers Union v. Meadowmoor Dairies (1941) 312 U.S. 287 [85 L.Ed. 836, 61 S.Ct. 552, 132 A.L.R. 1200] and Evers v. Birdsong (S.D. Miss. 1968) 287 F.Supp. 900. One of the cases relied upon by appellant, Mandel v. Municipal Court (1969) 276 Cal.App.2d 649, 664 [81 Cal.Rptr. 173] makes a similar distinction. See also In re Bacon, supra. The latter case also involved an administrative rule closing the school, even to students, during certain hours of the night and thereby closing it to all First Amendment uses. There was even more necessity for the present order (viewed not as a police order but as a school administrative order), and thus the Bacon decision fully justifies the decision here. We know of no cases that require a reversal, when the facts of the cases are considered.
Appellant cites a few of the cases requiring that we make an independent review of the entire record. We of course have done so to the extent that any constitutional questions are involved. We are not required to go further. (People v. Stroud (1969) 273 Cal.App.2d 670 [78 Cal.Rptr. 270].) However, for the information of appellant, we might add that we believe the conviction was fully justified by the facts, by the statute and by the Constitution. The record shows that Dr. Oviatt did not act hastily, but with great restraint. We must remember that the students who acted with violence were not thereby asserting constitutional rights but were selfishly interfering with the constitutional rights of others—and that such others, *Supp. 27 of all races, greatly outnumbered the relatively few students who resorted to violence. School administrative officials must protect the constitutional rights of all—even such a majority. Devoting a school exclusively to classes for the benefit of students who wished to learn appears to us to be a proper school purpose under the circumstances presented here.
Appellant also contends that the administrative order was invalid because Dr. Oviatt, before adopting it, did not consult with various interested student groups. Even if there had been time, there is no such duty. Appellant relies only on cases involving court orders, particularly Carroll v. Commissioners of Princess Anne (1968) 393 U.S. 175 [21 L.Ed.2d 325, 89 S.Ct. 347]. The' analogy'is farfetchéd and' is without" merit. In such cases there is such a duty, which is wholly lacking here.
Was evidence erroneously excluded? No.
Appellant wished to show 1) that the events relied upon by Dr. Oviatt to justify his order were in part caused by Dr. Oviatt’s own past policies, and 2) that the appellant remained in the forum area believing that Dr. Oviatt would revoke his order.- None of such evidence was relevant to-any issue in this lawsuit. The reasonableness of the order depended only on facts known to Dr. Oviatt, regardless of their truth or their cause. Even if a mistake had been made in the past, that would not lessen the need for an order if the current facts indicated a need therefor. The intent of the defendant is wholly immaterial, except the general intent to perform the proscribed act, i.e., remaining after being warned to disperse.
Was there error in receiving the testimony of the appellant? No.
Appellant complains because 1) he was not permitted to withdraw his testimony and 2) he claims the cross-examination went beyond the scope of the direct. The prejudice claimed is that without this testimony there is no evidence placing appellant at the scene of the crime and among those who remained after hearing the order to disperse. However, even on cross-examination, he testified without objection that he was arrested in the Open Forum area. Later questions were objected to on the ground-that they were immaterial and irrelevant because it was “admitted.” Also, there were movies showing his presence. If he was present, he had the same opportunity to hear the dispersal orders as everybody else. The sound truck had a range of 14 city blocks. Clearly, even if there were error in some ruling, there could have been no prejudice.
Was there error in refusing the instructions requested by defendant? No.
Elsewhere in this opinion, we discuss evidence and theories of appellant. *Supp. 28 The instructions relate to the same evidence and theories, and present no different problems.
Was the sentence excessive? No.
Even the case cited by appellant (People v. Smith (1968) 259 Cal.App.2d 868 [66 Cal.Rptr. 586]) indicates that the length of the sentence, within statutory limits, is a matter of discretion. It may not be attacked in this manner. People v. Schafer (1911) 161 Cal. 573 [119 P. 920], Moreover, appellant refused probation.
Should defendant have been acquitted because other defendants were acquitted in other courts? No.
See People v. Scoglio (1969) 3 Cal.App.3d 1 at p. 4 [82 Cal.Rptr. 869].
Were the comments by the trial fudge to the jury prejudicial? No.
We have read the comments and they were completely fair and impartial. Furthermore, the trial judge read the instructions defining the functions of judge and jury with respect to such comments, and also repeated such instructions as those on reasonable doubt. There was no error and no prejudice.
Was it error to refuse an alternative order to disclose the names of informants or dismiss? No.
The “informants” referred to were persons present at a meeting held by students and others in Pacoima the night before the arrests. There is no showing that they knew or might have known anything about the case other than what may be inferred from the fact that they were there. There is evidence that a professor (one of those arrested at the same time as appellant, and who was a witness for appellant) told Dr. Oviatt that the tone of the Pacoima meeting was “ugly” and “homicidal.” This is part of the information relied upon by Dr. Oviatt in making his order. Even if the informants could have testified at the time of trial that this information was false, that would not affect in the slightest the reasonableness of Dr. Oviatt’s reliance on his information at the time the order was made. The case of Honore v. Superior Court (1969) 70 Cal.2d 162 [74 Cal.Rptr. 233, 449 P.2d 169], relied upon by appellant, does not require furnishing the name of all informants but only those who “might” have information which might exonerate the defendant. But, as we .have already seen, whether their testimony would have been the same or different from the information relied upon, it would not have been relevant to the issue whether Dr. Oviatt’s reliance was reasonable at the time he made his order. A fortiori, under appellant’s own theory of the case, the informants could have supplied no relevant information, because *Supp. 29 appellant’s position throughout the trial was that no events prior to the actual meeting on January 9th were relevant to the issue whether the meeting was unlawful.
Was there an- insufficient waiver of a jury trial? No.
This point is not raised by appellant but, being a constitutional question, must be reviewed by us. The most important question decided (whether the Oviatt order was lawful) was decided by the judge without a jury. The defendant did not personally waive a jury trial. However, under the theory of the case as tried by counsel for appellant, there was no waiver (not even partial) of a juiy trial. Counsel tried the case upon the theory that the reasons of Dr. Oviatt for the issuance of the order were immaterial and that even his good faith with respect thereto was immaterial, and that the events prior to the actual meeting were immaterial with respect to the lawfulness of such meeting. He even took the view, as shown by his request for instructions, that if the meeting was peaceful then it was lawful even if the order was a legal order. If he was correct, then of course there was not even a partial waiver of a jury trial. In any event, under the circumstances, neither side attempted to submit the question a second time to the jury and hence the trial court was never required to rule upon the question (although he stated that he thought it was not a jury question). For the same reason, the question is not necessarily before us. Even if it could have been submitted to the jury, the failure of competent counsel (such as we have here) to present a defense is a matter of trial strategy (perhaps to carefully preserve his position that it was strictly a question of law) and is not the waiver of a jury trial. Judgment affirmed.
Whyte, P. J., and Vasey, J., concurred.

Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.