Opinion
SMITH, J.*
Defendants were convicted of violating section 409, Penal Code. This section makes it a crime to remain present at the place of an unlawful assembly after being lawfully warned to disperse. The fact. of remaining is not disputed. The fact that many warnings were given and heard is not disputed. The legality of such warnings is disputed. Defendants also deny that there was any unlawful assembly.
It is undisputed that on the morning of the arrests the assembled students were not violent and that all of them were waiting peacefully in the “forum” area (set aside for speeches) at the time of their arrests.
There were nevertheless two bases upon which it was contended by the People that the assembly was unlawful: 1) Dr. Oviatt, acting president of San Fernando Valley State College, made a determination as a school administrator that the campus would be closed to all public gatherings. Such determination was made between 6 a.m. and 7:30 a.m., before any *Supp. 5 assembly had occurred. Such determination was based on violence of the preceding two months and particularly the preceding two days. Students were first warned that such gatherings were banned; then warned that they would be arrested if they remained; and then arrested. 2) Captain Lembke of the police department, assigned to this school, made a determination that morning at 9:30 and after the assembly was in progress, based upon what he saw that piorning together with events of the prior two days and to a lesser extent the events of the prior two months# that the assembly constituted a danger to the safety of persons and property and was an unlawful assembly. Warnings were given and arrests followed.
Evidence supporting the first basis (but not the second) was presented in the trial of Lorretta Barrish and three other defendants. They were all acquitted on the same day and by the same judge who convicted the defendants now before us.
Two separate trials followed the Barrish trial. They were the Uptgraft trial and the Gandy trial. In both of the latter trials, Captain Lembke testified and the second basis was presented, in addition to the first basis. All defendants before us were tried either on the Uptgraft record or the Gandy record or, by stipulation, on the Uptgraft record plus the Barrish record or on all three records. Thus, evidence supporting both theories is present in all cases before us. However, since the four defendants in the Barrish case were acquitted at the same time that all of the present defendants were convicted, it is apparent that the convictions were not based upon the Oviatt determination and we will base our decision solely on the determination of Captain Lembke. Since other cases may come before us later where Dr. Oviatt’s determination alone was presented, it should be understood that we are not deciding that question one way or the other at this time.
There was no showing that anything was said or would be said at the forum on the day of the arrests which would constitute a clear and present danger, and hence the inference that an unlawful assembly existed cannot be justified on such basis. See Terminiello v. Chicago (1949) 337 U.S. 1 [93 L.Ed. 1131, 69 S.Ct. 894], and the first count in Cox v. Louisiana (1965) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453]. There are very few limitations that may be placed upon what is said, i.e., limitations on pure speech. However, acts and conduct incidental to speech may be regulated. The fact that people assert First Amendment rights does not place them above the law and immunize them from obeying state laws, so long as such state laws are enforced fairly and without discrimination. Cameron v. Johnson (1968) 390 U.S. 611 [20 L.Ed.2d 182, 88 S.Ct. 1335] (picketing may be stopped where it interferes with entrances to public buildings); Adderley v. Florida (1966) 385 U.S. 39 [17 L.Ed.2d *Supp. 6 149, 87 S.Ct. 242] (demonstrators may not block vehicular traffic and the entrance to a jail); Cox v. Louisiana (1965) supra, 13 L.Ed.2d 471 and companion case at page 487 (upholding the constitutionality of two statutes prohibiting obstruction to public passageways and regulating picketing near public buildings; although the convictions were reversed because of arbitrary, selective and improper enforcement); Edwards v. South Carolina (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680] (although convictions were reversed because there was no breach of the peace and that is all that defendants were charged with, the court stated that it would have been different if there had been obstruction of pedestrian or vehicular traffic); Milk Wagon Drivers Union v. Meadowmoor Dairies (1941) 312 U.S. 287 [85 L.Ed. 836, 61 S.Ct. 552, 132 A.L.R. 1200] (past violence justifies enjoining future picketing); Evers v. Birdsong (S.D.Miss. 1968) 287 F. Supp. 900 (demonstrating may be enjoined where it causes destruction of property and interference with education). Thus, in the present case we must determine whether the trial judge was justified in holding that the ¿ssembly had convened that morning, not just to talk and not just to provoke acts but to act, to act in violation of the law.
The intent of people is usually determined from the surrounding circumstances. (See § 21 of the Pen. Code.)
For two days, a definite pattern had been developing: First, students met in the forum. Second, they were there harangued by other students, teachers, and outsiders until they were worked up to the point of action. Third, they would march to the administration building and cause violence. This two-day pattern must be viewed in the light of a two-month pattern of violence on the campus, which we shall now review.
On November 4, 1968, a group of students occupied the fifth floor of the administration building. (B p. 150, G p. 198.)[1] They forcibly held as hostages for four hours a number of faculty members, administrative staff members and clerical staff members. (B p. 150, G p. 195.) They intimidated the president of the college and forced him to sign a paper which they dictated to him. (Gpp. 195-198.)
On December 8 the president’s office was set afire. (B p. 150, G p. 199.)
During December, there were several bomb threats. (B p. 150, U p. 264.) There was at least one other fire and there were fights in the college recreational halls where students were injured. (B pp. 150-151.)
On December 20 (the last day of school), there were fights in the forum *Supp. 7 (B p. 151, G p. 200, Up. 151), one student being injured enough to go to the hospital.
The Christmas holidays caused a gap between those events and the events immediately preceding the arrests.
On January 7, about 200 students met in the forum. Speakers said that if demands were not met, the school would be closed down and burned down. (B p. 92.) The 200 students marched from the forum to the administration building, where prior violence had occurred. They talked to and threatened Acting President Oviatt. (B pp. 93-94.) When a student tried to protect Dr. Oviatt, they hit the student, knocked his glasses off and knocked him to the ground. (B p. 95.) Other fights broke out between students. (B pp. 95-96.) The students left when the police arrived. The police heard students say they would be back tomorrow and if they did not get what they wanted, they would bum the place down. (B p. 96.) One officer heard 20 to 25 students make threats. (B p. 117.)
On January 8, the students again met at the fomm, went to the administration building, and returned to the forum. (B pp. 163-165.) At the fomm, speeches were made urging a confrontation and that if their demands were not met, there should be violence. (U p. 31.) Also, that if they did not get what they wanted, they should close the school and burn it down. (B pp. 97-98.) They again marched to the administration building. Students were overhead saying they would enter the administration building and occupy the fifth floor again. (B p. 229, U p. 32.) That is the floor where the November 4 violence occurred. Others told the girls to remove their earrings. The students were warned not to enter the building. Some did and were arrested. (U p. 32.) An urn and'pieces of pottery were thrown through windows. (Bp. 99.) A security guard was stmck numerous times with both fists and feet. His glasses were deliberately broken. (B p. 230, U p. 33.) They attempted to take an officer’s gun. (B p. 230, U p. 33.) After they were dispersed, three or four students said they were going to be “heavy” (i.e., armed) tomorrow. (B p. 100.) Students planned to make Molotov cocktails. (B p. 101, G pp. 103-104.) One said he was going to bring his .45 tomorrow, and a group discussed bringing their friends with weapons and fighting clothes. (U p. 36.) One officer heard as many as 25 to 30 threats regarding either being “heavy” or burning the school. (B p. 115.) Some students tried to remove iron bars from around the trees and others ran over the tops and hoods of parked cars, caving them in. (B p. 231.)
On January 9, the morning of the arrests, there was no violence and no speeches which would constitute a clear and present danger. However, the pattern of the previous two days started to repeat. They started to assemble in the forum. Many who had made threats on the 8 th were *Supp. 8 present on the 9th. (B p. 109, U p. 37, G p. 65.) Several were wearing helmets or carrying helmets. (U p. 42, G p. 74.) Speakers advised girls to remove their earrings. (U p. 44.) One individual was seen removing a rock, wrapping it, and placing it in a trash can. (B p. 236, U p. 48, G p. 75.) Several were carrying walkie-talkies. They were not police officers although two were helmeted. (U p. 69.) A few students were carrying empty pop bottles. (B pp. 124-125.)
What had occurred thus far on January 9, taken alone, would not support an inference that the assemblage was unlawful. Even when you add what had previously occurred, it would not justify an inference that any speeches were about to be made which by themselves would constitute a clear and present danger. The arrests must be justified, if at all, upon the basis of whether, from all of the circumstances, reasonable men could draw an inference that history was about to repeat itself and that the ultimate objective of the assemblage was not merely to provoke violence, but to actually engage in violence.
In view of the pattern of the last two months and particularly the last two days (i.e., first going to the forum; second,' speeches; third, violence), we cannot say as a matter of law that the trial judge erroneously drew that inference. We have no right to reweigh the evidence. Nor can we say as a matter of law that Captain Lembke erroneously drew the same inference. Thus his warning was lawful. If the police had been interested only in convictions and if they waited until the purpose of the assembly was manifested by acts instead of inferences, such timidity and delay might well have resulted in serious injury and property damage. The purpose of the legislation is to stop trouble before it occurs. On January 9, that purpose was realized. The escalating pattern of violence came to an abrupt stop. Just because the legislation was successful does not prove that it was not needed and not violated.
We must also give full effect to the rule that where First Amendment rights are involved, the reviewing court should make an independent examination of the entire record. This does not mean that the appellate court usurps the function of the jury or other fact finder with respect to each and every issue of an offense. Such independent review relates to constitutional problems only. In a case such as this, the rule requires us to ascertain whether the state statute, even though valid and violated, is being used as a subterfuge to curtail constitutional rights. There is no doubt that the arrests here not only interfered with but completely stopped a scheduled meeting and series of speeches, and thus the constitutional problem is squarely presented. Compare Cox v. Louisiana (1965) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453], holding that although a state statute *Supp. 9 prohibiting the obstruction of public passageways was valid and applicable, convictions thereunder for conducting a public meeting in such areas must be reversed because the state officials in enforcing the law did so on an arbitrary and selective basis. Also compare the second Cox case, 379 U.S. 559 [13 L.Ed.2d 487, 85 S.Ct. 476] holding that although a state statute prohibiting picketing near a courthouse was valid, convictions thereunder must be reversed because of arbitrary and misleading administrative enforcement which was akin to entrapment. The facts here are entirely different. Instead of suppressing free speech, the school officials at public expense provided the forum as a free speech area. There was no showing that any speeches had ever been censored at any time. The record is overwhelmingly clear that in the present instance, school officials were not concerned with mere speeches. If that had been the sole history of events, there would have been no police and no arrests. The whole record shows overwhelmingly that both the school officials and the police were very seriously concerned with escalating violence. The whole record overwhelmingly shows that the stated basis for the arrests was the actual basis for the arrests and subsequent convictions and such bases were fully justified. There was no sham or subterfuge. This is an example of forthright law enforcement designed to anticipate and avoid violence.
Thus, the convictions must be affirmed unless other claimed legal errors require otherwise.
Because in In re Bacon (1966) 240 Cal.App.2d 34 [49 Cal.Rptr. 322] and in Coverstone v. Davies (1952) 38 Cal.2d 315 [239 P.2d 876], the parties themselves were participating in an actual violation of the law which was presently occurring, appellants here argue that such present violation of the law is an essential ingredient of an unlawful assembly. However, section 407 of the Penal Code, in defining an unlawful assembly, speaks of persons assembled “to do” an unlawful act. It is not even made necessary by section 409 of the Penal Code that the defendants be participants in such unlawful assemblage if they are “present at the place” of such assemblage.
Because the defendants in the Barrish case were acquitted (as were a number of other defendants tried in other courts by other judges), appellants argue that the convictions 1) violate equal protection of the laws, and 2) are barred by collateral estoppel. At oral argument, it was recognized that these two labels do not exactly fit the problem and two more suggestions were made: 3) lack of due process, and 4) lack of fair play. The reason for the diflerences in results in these cases is much less profound. We have already noted that the Barrish trial lacked Captain Lembke’s testimony. The trial judge simply held that without that testimony, there was a *Supp. 10 reasonable doubt regarding the guilt of the defendants. It was so argued by counsel in the Barrish case. Even present counsel made several additional arguments in their attack upon the Oviatt order. The trial judge may (or may not) have been wrong in acquitting them, but there was no arbitrary refusal to equally enforce the law. The collateral estoppel argument is based on Teitelbaum Furs, Inc. v. Dominion Ins. Co. (1962) 58 Cal.2d 601 [25 Cal.Rptr. 559, 375 P.2d 439], which involved a much different problem and is inapplicable to this case.
Appellants rely upon Honore v. Superior Court (1969) 70 Cal.2d 162 [74 Cal.Rptr. 233, 449 P.2d 169], which is the latest of a long line of cases holding that when the People withhold the name of an informant who might have material evidence which might exonerate the defendant, the trial court must order the People to either 1) disclose, or 2) dismiss. There are no other alternatives. It is necessary, however, that the defendant make a showing that the informer might have substantial material evidence. This was not done. All we know from the record is that they were present at a meeting held the night before the arrests. What they saw or heard or might have seen or heard is not disclosed either by the pretrial record or by the trial record. While the cases no longer require the defendant to show what the informer would actually testify to, they still require a showing as to what he might testify to and a showing that such matter would be of substantial value and might exonerate the defendant. None of this was shown. Defendants simply made an ordinary pretrial motion, seeking a protective order, and they obtained what they sought. Counsel at the time of trial recognized that this was the situation and that the pretrial ruling was proper. (U p. 127.)
Appellants also contend that it was error to deny a new trial for failure to disclose evidence. The evidence referred to was not known to the prosecution until the People’s case was completed. It was immediately disclosed and the suggestion was made that the case might be reopened. Counsel for defendants declined. They are not entitled now to a second bite. Appeals from orders imposing fines and granting probation affirmed. Appeals from non-appealable order denying motion for new trial dismissed.
Vasey, Acting P. J., concurred.

Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

B represents Barrish; G represents Gandy; U represents Uptgraft reporter’s transcripts.