102 F.3d 406
 65 USLW 2455, 96 Cal. Daily Op. Serv. 8737,
96 Daily Journal D.A.R. 14,460,
97 Daily Journal D.A.R. 3813
 Rhonda COLLINS; Barbara Hall; Suzanne Jacks; Ileana
Bergere; Chris Martin; Natalie Nickle; Sandra
Perpignani; Thomas Stolmar, Plaintiffs-Appellees,
v.
Frank JORDAN, Defendant,
James Arnold; John Newlin; Walter Cullop, Defendants-Appellants.
Rhonda COLLINS; Barbara Hall; Suzanne Jacks; Ileana
Bergere; Chris Martin; Natalie Nickle; Sandra
Perpignani; Thomas Stolmar, Plaintiffs-Appellees,
v.
Frank JORDAN, Defendant-Appellant.
Rhonda COLLINS; Barbara Hall; Suzanne Jacks; Ileana
Bergere; Chris Martin; Natalie Nickle; Sandra
Perpignani; Thomas Stolmar, Plaintiffs-Appellees,
v.
Frank JORDAN, Defendant,
Richard Hongisto, Defendant-Appellant.
 Nos. 95-15737, 95-15738, 95-15739.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 12, 1996.
Decided Dec. 4, 1996.
 
 Andrew K. Gordon and Patrick J. Mahoney, Deputy City Attorneys, San Francisco, CA, for defendants-appellants.
 Rachel Lederman, Bayside Legal Advocates, San Francisco, CA, for plaintiffs-appellees.
 Appeals from the United States District Court for the Northern District of California, Claudia Wilken, District Judge, Presiding. D.C. No. CV 93-00741 CW.
 Before: REINHARDT and HALL, Circuit Judges and MERHIGE, Jr., District Judge.*
 REINHARDT, Circuit Judge:
 
 
 1
 Four hundred to five hundred people were arrested in San Francisco on the evening of May 1, 1992, two days after the announcement of the jury verdicts in the state criminal trial of the Los Angeles police officers who beat Rodney King. Among those were the named plaintiffs, who subsequently filed a class action against the City and County of San Francisco, then-Mayor Frank Jordan, and a number of highly-ranked San Francisco police officers, including then-Police Chief Richard Hongisto. Defendants moved for summary judgment on the merits and on the ground of qualified immunity.[1] With minor exceptions, the district judge denied the motions. Defendants (other than the City and County of San Francisco) appeal the district court's refusal to grant them qualified immunity.[2] The appeals raise important First and Fourth Amendment issues. We affirm in part and dismiss in part for lack of jurisdiction.
 
 Facts
 
 2
 On April 30, 1992, the day after the verdict in the first Rodney King beating trial was announced, a number of peaceful, though angry, demonstrations occurred in various parts of San Francisco. There was also a large not-so-peaceful demonstration in the downtown Civic Center area that led to a number of violent incidents, mostly involving property damage, although a few involved minor injuries, as well.[3] That evening, Mayor Jordan declared a local emergency and imposed a 9:00 p.m. curfew. The next day, May 1, 1992, he presented an Emergency Order to the Board of Supervisors, which approved it, with certain modifications. The order stated in pertinent part:
 
 
 3
 All peace officers under the command of the Sheriff or the Chief of Police of San Francisco are hereby authorized and directed to take all steps necessary to cause the dispersal and prevent the continuation of any gatherings of people anywhere in the City and County of San Francisco whenever the peace officer on the scene has reason to believe that the gathering endangers or is likely to endanger persons or property.
 
 
 4
 Officers are hereby authorized and directed to implement a policy of custodial arrests, rather than citations, for violations of any orders issued by the Mayor pursuant to the aforementioned emergency proclamation.
 
 
 5
 Any person who fails to comply with any order issued by a peace officer pursuant to this order commits a misdemeanor and is subject to immediate arrest.
 
 
 6
 The facts recited below concerning the events that occurred on May 1 are all set forth in the district court's order.
 
 
 7
 The Mayor and the police became aware that a demonstration was planned for the BART (Bay Area Rapid Transit) Plaza area at 24th and Mission Street, at 7:00 p.m. A contested, though not dispositive, factual issue is what the defendants learned in advance about the demonstration, and whether or not they had seen inflammatory fliers or possessed other information that might have given them reason to believe that some of the demonstrators intended to engage in violent or illegal actions.
 
 
 8
 Some people began to gather at the Plaza at about 6:30 p.m. Police officers were present at that location. They were also stationed one block north, just off 23rd and Mission, and one block east on 24th between Mission and Bartlett. Some time earlier that day, Commander Cullop had inspected the Plaza area and subsequently had gone back and forth between that location and others. When Commander Newlin arrived at the Plaza, he took command of the situation from Cullop. Chief Hongisto arrived at the scene at about 6:40 p.m. Newlin testified in his deposition that he reported his observations to Hongisto. There is, however, a factual dispute as to whether Newlin merely conveyed his impressions of the situation to Hongisto, or whether he actually recommended that the assembly be dispersed. In either event, included in his oral report was the following: There was a crowd that numbered in the hundreds; some members of the crowd had signs on dowels that he believed could be used as clubs; aggressive banter transpired that he believed to be similar to what he had heard the night before; and, finally, he believed the crowd to be hostile. Cullop said in his deposition that the crowd was much smaller (about 30) than Newlin claimed and that he had not observed anyone there doing anything illegal.
 
 
 9
 Shortly after Hongisto's arrival at the Plaza, he directed that a dispersal order be given. About 6:45 p.m., Newlin told Cullop to read the order, and Cullop did so. According to Commander Arnold, Newlin told him a few minutes later that Chief Hongisto had directed that the order be given and that people be arrested. The district judge noted that "[t]he videotape taken by the police shows that prior to the dispersal order, there were few people on the plaza and almost no activity." A number of other dispersal orders were subsequently given, both in English and in Spanish. The parties dispute, on the basis of conflicting testimony and videotape evidence, whether the people who had assembled by the time of the dispersal orders did or did not disperse, in whole or in part, following the issuance of the orders. The district court order cites the apparently conflicting deposition testimony of two of the defendants: "According to Captain Newlin, the crowd failed to disperse. Commander Cullop testified that the majority of the crowd ran from the plaza, and that only a few people remained in the plaza and were arrested there." At some point, some objects were thrown, including a beer can, which struck a policeman.
 
 
 10
 Shortly after the dispersal orders were given, a number of police officers moved into the Plaza. There is no dispute that following the announcement of the orders, some people who had been in the Plaza headed north on Mission, others east on 24th towards Bartlett Street. The parties do dispute whether these were organized groups that were refusing to obey the dispersal orders or simply individual people trying to leave an area they had been ordered to leave. Subsequently, a number of people who had been moving north on Mission, either as an organized group, as defendants contend, or as a diffuse body of individuals, as plaintiffs allege, were encircled and arrested at 23rd and Mission.
 
 
 11
 Cullop also spoke with Sergeant Hall, who was at 24th and Bartlett. Cullop directed Hall to encircle and arrest people at that location. While there was some testimony that some of the people had come from the Plaza, if so, they were heading away from downtown. Another very large group of about 200 to 300 people, which formed after the arrests at 23rd and Mission, was later encircled and arrested on Mission Street between 21st and 22nd. This group included people who appeared to be moving north in the direction of the Civic Center en masse, as well as ordinary bystanders and passersby. Finally, a separate group of people was encircled and arrested on Hartford Street between 17th and 18th, which is about a mile from the Plaza and west of the downtown area.
 
 
 12
 There are, as is evident from the above, substantial factual disputes concerning much of what occurred at or about the time of the mass arrests. As is usually the case with quick-moving, emotional and confrontational occurrences, the perceptions and recollections of the various witnesses differ drastically in both important and unimportant respects.
 
 
 13
 All of the persons arrested on the evening of May 1 were booked and held originally at Pier 38 in San Francisco, but were later sent to Santa Rita Jail, located across the East Bay, in a different county, where they were held for one or two nights. Plaintiffs contend and defendants do not dispute that the arrestees were finally released between 9:40 p.m. on May 2 and 5:30 a.m. on May 3. After being informed of the events that had transpired, the Board of Supervisors rejected Jordan's and Hongisto's recommendation to extend the Emergency Order. Instead, it rescinded the order early on the afternoon of May 2.
 
 Plaintiffs' Claims and Defendants' Motions
 
 14
 The named plaintiffs filed a class action alleging violations of the First and Fourth Amendments.[4] The First Amendment claims were to the effect that then-Mayor Frank Jordan and then-Police Chief Richard Hongisto had individually and acting together decided to ban all demonstrations, peaceful and otherwise, effective May 1, 1992, and to arrest all demonstrators who refused to obey dispersal orders. Plaintiffs also alleged that the events that occurred at the Plaza and other nearby locations did not provide probable cause for their arrest and the arrests violated both their First and Fourth Amendment rights. They further alleged that the failure to cite and release them following their arrests, as required by state law, violated their Fourth Amendment rights and that their subsequent detentions violated both constitutional provisions. In addition to Jordan and Hongisto, the plaintiffs named as defendants a number of high-ranking police officers who gave the dispersal orders and supervised the arrests. All the defendants sought qualified immunity.
 
 District Court Order
 
 15
 The district court denied defendants' motions for qualified immunity on almost all issues. Judge Wilken determined that there were material issues of fact in dispute as to whether there was any illegal activity or imminent danger of illegal activity on the part of the people assembled. She concluded that the existence of material disputes of fact precluded a determination that Hongisto and the three officers, who among them ordered the dispersals and arrests at the Plaza and the various other locations where arrests occurred, could reasonably have believed that (1) the assembled crowds constituted illegal assemblies and (2) there therefore was probable cause to make the arrests. She also found that there was evidence in the record that the police had arrested large numbers of passersby whom defendants could not reasonably have believed to have violated any city traffic ordinances or other laws. In addition, she concluded that evidence in the record supported the inference that both Jordan and Hongisto made and implemented a decision to ban all demonstrations, peaceful or otherwise. She cited other evidence in the record that supported the inference that at least Hongisto had a particular intention to prevent all demonstrations relating to the Rodney King verdicts. At the same time she concluded that there was insufficient evidence to raise a genuine issue of fact as to whether Jordan and Hongisto had engaged in a conspiracy. Finally, Judge Wilken also found that there were material factual issues in dispute relating to the reasonableness of Jordan's decision to hold the arrestees for up to 55 hours, as opposed to citing and releasing them. Indeed, she found that the facts supported an inference of reckless indifference, and that punitive damages might be appropriate.
 
 Appeal
 
 16
 The defendants all filed interlocutory appeals from the district court order denying qualified immunity. Their appeals raise both similar and dissimilar issues and they present arguments that sometimes are consistent and sometimes are not. We will discuss the basic legal points that apply generally to all defendants and then examine each defendant's contentions in turn.
 
 Qualified Immunity Doctrine
 
 17
 When a public official asserts qualified immunity for constitutional violations, the district court must apply a two-part analysis. Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993). The court must first determine whether the plaintiff has alleged a violation of a right that is clearly established and stated with particularity. Alexander v. County of Los Angeles, 64 F.3d 1315, 1319 (9th Cir.1995). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. The plaintiff bears the burden of showing that the right he alleges to have been violated was clearly established. E.g., Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir.1994). Second, the court must consider whether, under the facts alleged, a reasonable official could have believed that his conduct was lawful. Id. It is the defendant's burden to show that "a reasonable ... officer could have believed, in light of the settled law, that he was not violating a constitutional or statutory right." Id.
 
 
 18
 "Of course, if the facts alleged by the defendant officer could not support a reasonable belief that his conduct was lawful, he is not entitled to qualified immunity." Act Up!, 988 F.2d at 873. The determination of whether a reasonable officer could have believed his conduct was lawful given the totality of the circumstances is a determination of law that can be decided on summary judgment if the material facts are undisputed. Id. If, however, there is a material dispute as to the facts and circumstances that an officer knew or should have known, or as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial. See id.
 
 Jurisdiction
 
 19
 We have jurisdiction to hear an interlocutory appeal from a denial of qualified immunity when the question involves a matter of law. Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816-17, 86 L.Ed.2d 411 (1985). On the other hand, as the Supreme Court has made clear in two recent cases, federal appellate courts lack jurisdiction to hear certain interlocutory appeals from denials of qualified immunity in other circumstances. Behrens v. Pelletier, 516 U.S. 299, ----, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996); Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Where the district court denies immunity on the basis that material facts are in dispute, we generally lack jurisdiction to consider an interlocutory appeal. Specifically, if the appellant argues that, contrary to the district court's assertions, an examination of the record reveals that there is no dispute as to the facts, or that there is not sufficient evidence in the record to create such a dispute, we must dismiss for lack of jurisdiction. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157; see also Armendariz v. Penman, 75 F.3d 1311, 1317 (9th Cir.1996) (en banc). Nevertheless, a denial of summary judgment on qualified immunity grounds is not always unappealable simply because a district judge has stated that there are material issues of fact in dispute. See Behrens, 516 U.S. at ----, 116 S.Ct. at 842. An appellate court still has jurisdiction to consider defendants' assertion that the dispute of fact is not material. Id. Such a claim is of a different character from a claim that the court's findings are not supported by the record. The claim of lack of materiality is solely one of law, and therefore is reviewable on an interlocutory basis. Id. We note that although under the analytical framework described above we have jurisdiction to consider two of the principal issues raised by defendants because they involve the materiality of disputed matters or are otherwise questions of law, much of defendants' argument is to the effect that the record does not support Judge Wilken's determinations regarding the existence of factual disputes. We simply do not have jurisdiction to consider those contentions for the reasons set forth by the Court in Johnson.
 
 
 20
 After carefully reviewing defendants' contentions on appeal, and sorting out the contentions of law from the contentions of fact, we conclude that we have jurisdiction to consider the following two principal legal issues on this interlocutory appeal: 1) whether Chief Hongisto could reasonably have believed on May 1, 1992 that, on the basis of the events that undisputedly had transpired on April 30, it was lawful to prevent all demonstrations, peaceful or otherwise, throughout the City of San Francisco; and 2) whether Mayor Jordan could reasonably have believed that he could exercise his discretionary authority to hold the arrested demonstrators in jail for up to 55 hours for the purpose of preventing them from engaging in further demonstrations, instead of citing and releasing them like other misdemeanor arrestees. We dismiss most of defendants' remaining contentions for lack of jurisdiction.
 
 
 21
 The Defendants' Individual Claims of Qualified Immunity Chief Hongisto
 
 
 22
 Hongisto seeks qualified immunity for the dispersals and arrests. There are two principal issues involved in determining whether he is entitled to immunity: 1) whether given the established state of First Amendment law, a reasonable officer would have known that a decision to prevent all demonstrations based on the events of the preceding day would violate the constitutional rights of those desiring to engage in peaceful protests; and 2) whether such an officer would have known that the events at the Plaza and other nearby locations did not justify dispersal orders and arrests. If the answer to either question is "No," Hongisto would prevail, at least in most respects. The second issue, however, turns on factual questions. Judge Wilken found issues of fact in dispute regarding the events at the Plaza that are unquestionably material. Thus, we lack jurisdiction to consider the second issue. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157.
 
 
 23
 As to the first issue, the district judge found that there was testimony tending to prove that the decision to ban all demonstrations had been made in advance of the events that occurred at the Plaza: that Hongisto and Jordan had decided earlier in the day to ban all demonstrations city-wide, peaceful or not.[5] At oral argument, Hongisto conceded for the purposes of this appeal that he had a preconceived intent to prohibit all demonstrations. Thus, we have jurisdiction to consider Hongisto's legal contention that he is entitled to qualified immunity because the law was not clearly established that, given the events of the previous day, an order to ban all demonstrations and arrest all demonstrators would be unconstitutional. We reject the contention.
 
 
 24
 Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); NAACP Western Region v. City of Richmond, 743 F.2d 1346 (9th Cir.1984). It has been clearly established since time immemorial that city streets and sidewalks are public fora. E.g., United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706-07, 75 L.Ed.2d 736 (1983); Hague v. C.I.O., 307 U.S. 496, 515, 59 S.Ct. 954, 963-64, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.); accord Gaudiya Vaishnava Society v. City and County of San Francisco, 952 F.2d 1059, 1065 (9th Cir.1990). Restrictions on First Amendment activities in public fora are "subject to a particularly high degree of scrutiny." NAACP Western, 743 F.2d at 1355. The law is also clear that the government may not prohibit angry or inflammatory speech in a public forum unless it is (1) "directed to inciting or producing imminent lawless action" and (2) "likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam); see also Hess v. Indiana, 414 U.S. 105, 108, 94 S.Ct. 326, 328-29, 38 L.Ed.2d 303 (1973) (per curiam). Speech that stirs passions, resentment or anger is fully protected by the First Amendment. Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949) ("[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.").
 
 
 25
 California state law also reflects these fundamental constitutional principles. While California Penal Code § 407 defines unlawful assembly as "whenever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous assembly," the California Supreme Court has properly narrowed the statute, in accordance with the requirements of the First Amendment, to those assemblies "which are violent or which pose a clear and present danger of imminent violence," In re Brown, 9 Cal.3d 612, 623, 108 Cal.Rptr. 465, 510 P.2d 1017 (Cal.1973). Thus, it is clearly established federal and state law that protests or assemblies cannot be dispersed on the ground that they are unlawful unless they "are violent or ... pose a clear and present danger of imminent violence," id., or they are violating some other law in the process, e.g., In re Bacon, 240 Cal.App.2d 34, 49 Cal.Rptr. 322 (1966) (police properly determined that assembly was unlawful where demonstrators refused to leave public building after closing time).
 
 
 26
 Finally, enjoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation. Carroll v. President and Com'rs of Princess Anne, 393 U.S. 175, 180-81, 89 S.Ct. 347, 351-52, 21 L.Ed.2d 325 (1968); Laurence Tribe, American Constitutional Law, § 12-34, at 1041 (2d ed. 1987) (collecting cases). The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct. Carroll, 393 U.S. at 180-81, 89 S.Ct. at 351-52; Kunz v. New York, 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951) (distinguishing subsequent punishment from suppression of speech); Collin v. Chicago Park District, 460 F.2d 746, 754 (7th Cir.1972).
 
 
 27
 Hongisto contends, however, that the First Amendment allows the banning of all protests on "the inference of a continuing threat of past misconduct." In other words, he argues that instances of previous violence or unlawful activity either create an exception to the "clear and present danger" test or are sufficient to meet that test. Thus, he contends that he reasonably could have believed, in light of the violence that transpired on the previous evening, that it was lawful to prevent all demonstrations on May 1, 1992. We disagree. As a matter of law, it was clear at that time, as it is today, that the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter).[6]
 
 
 28
 The defendants correctly assert that violence had occurred on the evening of April 30, following an angry demonstration over the Rodney King verdict in the Civic Center area of San Francisco.[7] The record contains evidence of a few injuries to people, none of them extensive or life-threatening. The principal incidents involved property damage and appear to have been confined to an area of about four blocks on Market Street, although there were other isolated instances of looting and vandalism as well. The record also reflects that most of the city was free from any form of unlawful conduct. Videotape evidence shows that there were other large demonstrations in San Francisco on April 30, in addition to the one near the Civic Center, and that the other demonstrations, though angry, were completely peaceful. For example, there is testimony in the record from the defendants concerning a large, peaceful demonstration at 19th and Holloway near San Francisco State University, and another on the Bay Bridge.
 
 
 29
 The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence. There are sound reasons for this rule. Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, see, e.g., Cox v. Louisiana, 379 U.S. 536, 551, 85 S.Ct. 453, 462-63, 13 L.Ed.2d 471 (1965), and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure. Kunz, 340 U.S. at 294-95, 71 S.Ct. at 315-16. Courts have many times emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events. E.g., NAACP Western, 743 F.2d at 1346; see also Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion.
 
 
 30
 Hongisto relies principally on Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941), and People v. Uptgraft, 87 Cal.Rptr. 459, 8 Cal.App.3d Supp. 1 (1970), to support his contention that, in light of the activities of the previous night, it was reasonable for him to believe that banning all demonstrations was lawful. His reliance on Milk Wagon Drivers is wholly misplaced. In that case, the Court upheld an injunction against a particular union's activities that were targeted at a single company. The injunction was issued following repeated episodes of serious violence, including a number of incidents in which people were severely beaten, most of which incidents were directly tied to the union being enjoined. The injunction was "confined to conduct near stores dealing in respondent's milk, and it deal[t] with this narrow area precisely because the coercive conduct affected it." Id. at 298, 61 S.Ct. at 557. In short, the case involved a narrow and strictly limited order that was directed at a particular organization that had repeatedly engaged in serious violence at specific locations. A ban on all demonstrations by all people in a major metropolitan area like San Francisco bears little relation to the type of injunction at issue in Milk Wagon Drivers. See Madsen v. Women's Health Center, Inc., 512 U.S. 753, ----, 114 S.Ct. 2516, 2525, 129 L.Ed.2d 593 (1994) (citing Milk Wagon Drivers for the proposition that courts must ensure that an "injunction [is] no broader than necessary to achieve its desired goals").
 
 
 31
 Hongisto's reliance on People v. Uptgraft, 8 Cal.App.3d Supp. 1, 87 Cal.Rptr. 459 (1970), is similarly misplaced. That case involved the legality of a declaration by the police that a group of students at a state college who had gathered at a particular location constituted an unlawful assembly. The court found that there had been a two-month pattern of regular violence and threats of violence by the students. On the day that the assembly was dispersed and arrests made, the police observed a number of the students who had made threats the day before, including threats to burn the school down. In addition, some individuals at the gathering were wearing helmets. The court found that the events of the day in question, when combined with the previous violent occurrences, and the ties between a number of the students and specific past threats and acts of violence, justified the declaration of an unlawful assembly. Id. at 8-9, 87 Cal.Rptr. 459. The facts and circumstances in Uptgraft bear little relation to the facts and circumstances of the case before us. Similarly, Uptgraft 's determination that a particular gathering could be declared an unlawful assembly sets forth no legal principles that are applicable to the question over which we have jurisdiction on appeal--whether a reasonable public official could have believed that a city-wide ban on all demonstrations could be ordered. In fact, Uptgraft has little if any relevance to the other question raised by Hongisto--whether a reasonable police officer could have believed that the events that occurred at the Plaza justified the declaration of an unlawful assembly.
 
 
 32
 We need not address the question of whether at some point--for example if there is widespread continuing violence that appears to be beyond the ability of the police to control--a time-limited ban on all demonstrations might be lawful. Similarly, we need not decide whether, and under what circumstances, specific, reliable information that organized violence of a serious nature is about to occur might justify a determination that a clear and present danger exists warranting the banning of a particular demonstration. Cf., Collin, 460 F.2d at 754 (considering but not answering a similar question). Today, we decide only that the violence and disorder that occurred in San Francisco on April 30 falls far short of the type of occurrence that could have led any reasonable official to believe that it would be constitutional to impose a city-wide ban on all demonstrations, and that the law to that effect was clearly established.
 
 
 33
 Before leaving the question of the reasonableness of Hongisto's beliefs, we can quickly dispose of his assertion that banning all protests was reasonable because the city had enacted a curfew that forbade anyone from being on the streets after 9:00 p.m. Assuming the legality of the curfew order, the fact that authority exists to ban everyone from using the streets during nighttime hours does not justify a selective ban on specific First Amendment conduct during daylight hours. Proclaiming a curfew that requires people to remain at home during certain hours is obviously an entirely different matter from prohibiting only specific First Amendment activities during those or other hours. The latter action is far more directly restrictive of the right of free expression. Compare United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (applying "intermediate scrutiny" to statute prohibiting conduct but incidentally restricting First Amendment freedom), with United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (applying "strict scrutiny" to statute specifically prohibiting various forms of First Amendment activities in a public forum).[8]
 
 
 34
 In sum, Judge Wilken correctly decided the legal issue raised by Hongisto--whether a reasonable official could have believed, in light of the events of the previous day, that a total ban on demonstrations was lawful. See Act Up!, 988 F.2d at 873. The answer is unequivocally "No."
 
 
 35
 Whether Hongisto actually did decide to ban all demonstrations in advance is, despite his concession for purposes of this appeal, a factual issue to be decided at trial. As to the other factual issues Judge Wilken found to be in dispute, they are, as we have noted, material to other of Hongisto's arguments, including his other principal contention: that a reasonable official could have believed that declaring an unlawful assembly and arresting the plaintiffs at the Plaza and the neighboring locations was legal in light of the events transpiring at the scene. In this connection, Judge Wilken concluded that there are disputed facts in the record as to whether, inter alia, there was any immediate threat of illegal activity or any manifested intent on the part of the demonstrators to engage in such conduct. We do not have jurisdiction to consider whether there is in fact conflicting evidence in the record to support that or any other conclusion reached by the district court. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157.
 
 Hongisto's State Law Immunity Claim
 
 36
 Hongisto also appeals the denial of his motion for state statutory immunity. He asserts that he did not participate in any of the actions that plaintiffs challenge and that he cannot be held liable on a respondeat superior basis for the actions of others. Hongisto's argument is no more than an attack on Judge Wilken's determination that there are material issues of fact as to whether "Chief Hongisto ... made the determination to prevent the demonstrations by way of dispersal orders and arrests, and ordered the whole course of events." Reviewing the record to determine whether there is sufficient evidence to support Judge Wilken's determination that there is a factual dispute as to Hongisto's direct participation in the arrests would require us to do what we lack jurisdiction to do under Johnson. We must, therefore, decline to exercise jurisdiction over the denial of state law immunity.[9]
 
 Mayor Jordan
 
 37
 Plaintiffs make two primary claims against Mayor Jordan: 1) that he participated in or caused their arrest in violation of the First and Fourth Amendment; and 2) that he violated their Fourth Amendment rights by ordering them held in Santa Rita Jail for up to 55 hours, rather than citing and releasing them pursuant to California Penal Code § 853.6.
 
 
 38
 As to the first claim, Jordan initially asserts that plaintiffs failed to meet their burden of alleging a violation of clearly established law. Doe v. Petaluma City School District, 54 F.3d 1447, 1450 (9th Cir.1995). He points to the broad descriptions in the plaintiffs' consolidated opposition to the motion for summary judgment of the rights they allege were violated. However, plaintiffs allege in their complaint that Jordan took a number of actions designed to prevent and break up protests and to bring about the arrests of First Amendment protesters without probable cause to believe that any illegal conduct was occurring or about to occur. Such conduct would violate clearly established First and Fourth Amendment rights.
 
 
 39
 Jordan's second contention is that he is entitled to qualified immunity because the plaintiffs have neither demonstrated a sufficient causal connection between his actions and their injury nor established any other theory of supervisory liability. Judge Wilken found that there were triable issues of fact as to whether policy-makers, specifically including Jordan, "decided to prevent any demonstration at all, regardless of its peaceful nature." She also stated that there was evidence in the record that Jordan closely monitored and concurred in the police actions. Jordan does not contend that if he acted to prevent all demonstrations from taking place whether or not they constituted unlawful assemblies, and he worked with Hongisto or others to implement such a policy, he would be entitled to qualified immunity. The basis of his appeal is simply that there is not sufficient evidence in the record to support a claim that he caused or directly participated in the decision-making process or its implementation. Given Judge Wilken's determination, we lack jurisdiction to consider Jordan's argument. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157; Armendariz, 75 F.3d at 1318.
 
 
 40
 Jordan's Decision to Hold the Arrestees at Santa Rita Jail
 
 
 41
 Judge Wilken also denied Jordan's motion for qualified immunity with respect to the allegation that he violated the Fourth Amendment rights of the demonstrators by ordering that they be held and sent to Santa Rita jail across the East Bay, rather than cited and released, like all other misdemeanants. Plaintiffs point, inter alia, to California Penal Code § 853.6, which provides that misdemeanor arrestees shall be cited and released, except where an enumerated exception to the statute applies.
 
 
 42
 We reserve judgment as to whether an independent Fourth Amendment claim exists or whether the inquiry into the reasonableness of the detention should simply be treated as part and parcel of the plaintiffs' First Amendment claim.[10] The district court correctly noted that the detentions--not only the arrests--are relevant to the First Amendment claim. As its order makes plain, there is substantial evidence supporting the inference that while the arrests were designed to end the demonstrations then occurring, the detentions were intended to prevent future demonstrations.
 
 
 43
 Specifically, the district court's order supports the inference that Jordan determined pursuant to his discretionary authority that the demonstrators should be held in custody, instead of being cited and released, to keep them from engaging in further First Amendment activity. The district court recites the fact that Jordan was in constant touch with police officials handling events at the Plaza as they unfolded, and that, approximately five hours after the demonstrations were aborted and the arrests were made, Jordan ordered the arrestees sent to the Santa Rita Jail, over the objection of Sheriff Hennessey.[11] In short, in the case of the detention issue as in the case of the arrests, the district court order reflects a genuine dispute of material fact regarding Jordan's intent to violate the First Amendment.
 
 
 44
 While the question of Jordan's actual motive must be resolved at trial, not on this appeal, it is evident that keeping the plaintiffs in custody to prevent them from demonstrating would constitute a violation of their First Amendment rights--regardless of whether it would also constitute an independent violation of the reasonableness requirement of the Fourth Amendment. The existence of the First Amendment violation raises not only a legal question, see supra note 10, but also a practical one as to the role in this case of the purported Fourth Amendment violation. The two alleged constitutional infringements involve the same operative facts and the same discretionary decisions and actions by Jordan. The damages for any unreasonable detention would appear to be fully recoupable as a part of plaintiffs' First Amendment claim, and the establishment of a Fourth Amendment violation would probably not result in any additional recovery. From plaintiffs' standpoint, therefore, it appears that little purpose would be served by pursuing the Fourth Amendment issue independently. The same appears to be true from Jordan's standpoint. Asserting a qualified immunity defense to the Fourth Amendment claim would not serve the purpose contemplated by the qualified immunity rule, nor would it accomplish Jordan's objective. Qualified immunity is designed to protect government officials from undergoing unnecessary trials on essentially meritless claims. Here, however, all of the evidence that would be introduced to prove a Fourth Amendment violation could be introduced with respect to the First Amendment claim. The trial Jordan would undergo would be virtually the same, regardless of whether the plaintiffs were permitted to bring both claims or only the one based on the First Amendment. Under those circumstances, we decline to answer the unbriefed and difficult questions regarding the possible applicability of Whren to the Fourth Amendment issues in this case.[12]
 
 
 45
 Our rationale applies whether the alleged Fourth Amendment violation is based on the claim that Jordan intended to infringe First Amendment rights or on the theory that the detentions were unreasonable because they violated the cite and release policy set forth in California Penal Code § 853.6. The latter theory raises a difficult legal question, strongly contested by the parties, concerning the interaction between state law and the Fourth Amendment. Again, no practical purpose would be served by answering that question on this interlocutory appeal, and we therefore decline to do so at this time.
 
 State Law Immunity
 
 46
 The plaintiffs have also made a number of state law claims in their complaint; Jordan appeals the denial of his motion under California Government Code § 820.8 for state law immunity with respect to those claims. Judge Wilken found that disputes of material fact precluded any decision regarding Jordan's immunity claims. We do not have jurisdiction to review that determination. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157. In addition, because this issue is entirely separate from the legal issues we have jurisdiction to hear on an interlocutory basis, we have serious doubts as to whether we would have an independent basis for jurisdiction to consider this issue, even if the basis for the district court's ruling were a purely legal one. See Swint, 514 U.S. at ----, 115 S.Ct. at 1211.[13]
 
 Defendants Cullop, Newman, and Arnold
 Common Issues
 
 47
 Defendants Cullop, Newman, and Arnold raise a number of issues that they characterize as legal questions we have jurisdiction to review. For example, they repeatedly contend that the district court failed to define the rights at issue with the proper degree of specificity. They state:
 
 
 48
 Indeed, this Court made clear that the specific right at issue is defined by the plaintiff's conduct. See Backlund v. Barnhart, 778 F.2d 1386, 1389 (9th Cir.1985). Looking at the conduct here, plaintiffs had to prove that they have a clearly established constitutional right to: (1) continue to demonstrate during a state of emergency when their protest shows signs that it is turning violent; (2) and remain assembled by marching as a group in the middle of the street after an order to disperse. Plaintiffs did not and cannot prove that the Constitution gives them such rights.
 
 
 49
 We have no quarrel with the general proposition that an established right must be defined with the appropriate level of specificity. However, the defendants' argument that the district judge made a legal error is based on the assumption that their version of the disputed facts is correct. When, on summary judgment, the district court found that there were material issues of fact in dispute, it did not err by failing to assume the defendants' version of the disputed facts. To the contrary, it was required to accept the plaintiffs' version, if the record so permitted. E.g., Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 50
 The individual defendants contend that the district court erred in denying qualified immunity because there is no right not to be arrested for participating in an unlawful assembly. The district court concluded that there were material facts in dispute as to whether the assemblies were unlawful and whether a reasonable officer could have believed that they were. Likewise, it concluded that a genuine dispute of fact existed as to whether the plaintiffs' conduct justified their arrest and whether a reasonable officer could have believed that it did. Under plaintiffs' version of the facts, no reasonable officer could have believed that the assemblies were unlawful or that the conduct of the demonstrators was such that probable cause to arrest them existed.
 
 
 51
 Placed in proper perspective, the common arguments of the individual defendants are largely that the district judge is wrong as to the facts or that the factual record does not support her conclusions. These arguments, as we have previously explained, are beyond our jurisdiction on interlocutory appeals. Accordingly, we dismiss the individual officers' common contentions for lack of jurisdiction.
 
 
 52
 Defendants Cullop, Newman, and Arnold raise an additional common argument that is largely legal in nature. They contend that the Emergency Order differed materially from the California Penal Code and that they can "rely on it to prove that the clearly established law did not prohibit the conduct for which they have been sued." In contrast, Jordan argues that the Emergency Order was consistent with long-established state law. He concedes in his brief that the proclamation "did not undermine any of the plaintiffs' clearly established rights as its provisions were nearly identical to the California Penal Code." The order reads in relevant part:
 
 
 53
 All peace officers under the command of the Sheriff or the Chief of Police of San Francisco are hereby authorized and directed to take all steps necessary to cause the dispersal and prevent the continuation of any gatherings of people anywhere in the City and County of San Francisco whenever the peace officer on the scene has reason to believe that the gathering endangers or is likely to endanger persons or property.
 
 
 54
 The individual officers state that they did not make any arrests under the order, but that it "effected (sic) their decisions." We reject their argument. Nothing in the order should have led a reasonable officer to believe that it altered the long-standing California law that assemblies can be dispersed as unlawful only when they constitute a clear and present danger.[14] After the proclamation, as before, the officers had the authority to declare an unlawful assembly or arrest the demonstrators only when such a danger existed.
 
 Commander Cullop
 
 55
 The district judge granted Cullop's motion for summary judgment insofar as he merely followed Hongisto's orders to disperse the crowd at 24th and Mission, but denied it with respect to his ordering the arrests at 23rd and Mission and 24th and Bartlett. Judge Wilken found issues of fact in dispute as to whether 1) the arrestees at 23rd and Mission could reasonably have been viewed as posing a clear and present danger or as disregarding an order to disperse given at 24th and Mission;[15] 2) large numbers of the arrestees had come from 24th and Mission on the sidewalk, and had thus complied with all applicable traffic ordinances; and 3) a sizable number of people arrested at 24th and Bartlett were not even part of any gathering at 24th and Mission and thus had not failed to disperse (even if those who had been at 24th and Mission actually did disobey a dispersal order). Judge Wilken cited evidence in the record indicating that large numbers of people who had neither participated in an assembly, whether lawful or unlawful, nor violated any traffic laws, were encircled and arrested without even having being told to disperse. The factual disputes involved are material and therefore preclude an award of qualified immunity to the defendant. In view of the existence of these disputes discussed above, we need not decide the far narrower issue raised by Cullop whether a police officer would be entitled to qualified immunity for the arrest of a few people who were inadvertently swept up in a larger group for which an officer reasonably believed he had probable cause to make arrests.
 
 
 56
 As is the case with the individual officers' common argument, Cullop's contention here, when properly analyzed, is essentially that the record does not support Judge Wilken's conclusion that factual disputes preclude summary judgment. We do not have the jurisdiction to consider that argument on interlocutory appeal, and dismiss Cullop's independent claim for that reason. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157.
 
 Captain Newlin
 
 57
 In denying Captain Newlin's motion for summary judgment, Judge Wilken stated: "Captain Newlin's conduct, in recommending dispersal at the BART Plaza, and in directly supervising the arrests at 24th and Bartlett and at 18th and Hartford, likewise has not been established to be objectively reasonable on the record before the Court." As to Newlin's ordering the arrests at 24th and Bartlett and 18th and Hartford, we lack jurisdiction to review Judge Wilken's determination that material issues of fact are in dispute as to whether Newlin could reasonably have believed the arrestees were part of an unlawful assembly or had otherwise acted illegally. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157.
 
 
 58
 As to the events at 24th and Mission, Judge Wilken again denied the motion on the basis that there are genuine issues of material fact that must be resolved as to the circumstances existing there at the time the dispersals were ordered and the arrests made. Newlin contends, however, that despite any factual issues that must be resolved, he is entitled to qualified immunity because he merely gave his impressions of the situation to Hongisto. However, it is clear that a genuine issue of fact exists as to this question also. Based on inferences that may be drawn from the record, there is a genuine dispute as to whether Newlin merely reported the "facts" or effectively recommended the arrests of the demonstrators. Further, an issue exists as to whether Newlin falsely reported the "facts" and was for that reason legally responsible for the subsequent "unlawful" actions. In view of these factual disputes noted by the district court, we do not have jurisdiction to review Newlin's individual contentions. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157.
 
 Commander Arnold
 
 59
 Commander Arnold, who ordered the arrests at 21st and Mission and 18th and Hartford, contends that his behavior was reasonable because he had a legitimate basis for believing that the arrestees had failed to disperse, were violating traffic laws, and possibly constituted an unlawful assembly when they were arrested. As in the case of the other officers, however, Judge Wilken held that there are material issues of fact in dispute that preclude summary judgment. For example, Judge Wilken found genuine disputes as to 1) how many people who were originally at 24th and Mission reached either 21st and Mission or 18th and Hartford; 2) whether anyone at 21st and Mission was ever part of an unlawful assembly; and 3) whether large numbers of people who were encircled and arrested at 21st and Mission had engaged exclusively in lawful conduct and had at all times been on the sidewalk consistent with city traffic laws.[16] These disputes are material to the question of what Arnold could reasonably have believed. Accordingly, we lack jurisdiction to consider Commander Arnold's contention that there is no actual dispute as to the issues set forth above. Johnson, 515 U.S. at ----, 115 S.Ct. at 2157.
 
 Conclusion
 
 60
 For the reasons stated above, we affirm the district court's denial of summary judgment in part and dismiss the interlocutory appeals in part.
 
 
 61
 AFFIRMED in part; DISMISSED in part.
 
 
 
 *
 The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 San Francisco moved for summary judgment on the basis that it was not liable under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The court denied the motion in an order that is not appealable on an interlocutory basis. Swint v. Chambers County Comm'n, 514 U.S. 35, ----, 115 S.Ct. 1203, 1211, 131 L.Ed.2d 60 (1995). Jordan also asserted that he was entitled to absolute legislative immunity with respect to issuance of the emergency proclamation and order. The district court agreed, and that issue is not before us either
 
 
 [2]
 In the opinion, the term "defendants" refers to all of the named individuals collectively
 
 
 [3]
 There is a dispute of fact as to whether the violence erupted only after police charged into the demonstration, scattering the demonstrators, or whether the vandalism and violence was unrelated to the police activity
 
 
 [4]
 Plaintiffs filed other federal and state claims, which are not at issue in this appeal
 
 
 [5]
 As to Hongisto, Judge Wilken stated, "there is every indication that Chief Hongisto, a policy maker within the meaning of Monell, made the determination to prevent the demonstrations by way of dispersal orders and arrests, and ordered the whole course of events."
 
 
 [6]
 Hongisto does not contend that the Emergency Order of the Board of Supervisors authorized the banning of demonstrations that did not constitute a clear and present danger under California law
 
 
 [7]
 As noted at pp. 412-13 supra, where the district judge identifies disputes of fact or makes inferences from the record, we do not have jurisdiction to evaluate those determinations by making an independent review of the record. Where, however, the district court has not identified the facts on which it relies, we must look to the record ourselves. Johnson, 515 U.S. at ----, 115 S.Ct. at 2159. Because the district court merely repeated Jordan's statement that he proclaimed a local emergency in response to demonstrations and incidents of looting and vandalism, we have reviewed the record, including the tapes submitted by the parties, to determine what evidence it contains regarding the previous day's events
 
 
 [8]
 Judge Wilken also determined that there was evidence in the record sufficient to create a triable issue as to whether Hongisto intended to prohibit demonstrations on the basis of their content, that is, those demonstrations concerning the Rodney King verdicts. Because we have determined that Hongisto is not entitled to qualified immunity we need not determine whether the presence of an "improper" motive would constitute an additional basis for liability, or what the effect of this additional factor might be on any damage claims. Of course, content based restrictions on speech in public fora are presumptively unconstitutional. See, e.g., Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); Police Dep't of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); accord National Advertising Co. v. City of Orange, 861 F.2d 246, 248 (9th Cir.1988)
 
 
 [9]
 We do not decide whether, even if Johnson failed to bar our consideration of this issue, it would be appropriate for us to consider it here. Neither party has advised us whether California state law contains comparable qualified immunity rules or whether if so the existence of those rules would result in an exception to the general rule that precludes our assertion of "pendent appellate jurisdiction" in collateral qualified immunity appeals. See Swint v. Chambers County Comm'n, 514 U.S. 35, ----, 115 S.Ct. 1203, 1211, 131 L.Ed.2d 60 (1995)
 
 
 [10]
 In Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), which held that under the Fourth Amendment the reasonableness of a traffic stop for which probable cause exists does not depend on the motivation of the police officer making the stop, the Court suggested that where the officer's motivation is to deprive the person detained of an independent constitutional right--i.e., equal protection--the claim should be based not on the Fourth Amendment but on the independent constitutional ground. Id. at ----, 116 S.Ct. at 1774. We need not decide whether that analysis would apply to the case of a Mayor or other official with policymaking authority who adopts policies that have the effect of violating the reasonableness requirement of the Fourth Amendment when those policies are adopted for the purpose and with the effect of violating a plaintiff's First Amendment rights. Whren was decided after the parties filed their briefs and only two days before oral argument, so neither party addressed the issue. In any event, we need not resolve it here
 
 
 [11]
 In his Declaration of Local Emergency, Jordan exercised his discretion in ordering the police to "do whatever may be deemed to be necessary, under [his] direction," to deal with the demonstrators. His authority to give such discretionary orders was reaffirmed in the subsequent Emergency Order ratified the following day by the Board of Supervisors
 
 
 [12]
 We leave it to the district court to decide in the first instance whether to submit to the jury both the First and the Fourth Amendment claims. If it does so, it could help clarify the issues for this court in the event of a further appeal by eliciting from the jury separate verdicts stating whether it finds liability on each of the alleged First Amendment violations, i.e., the arrests and the detentions, and, if so, how it apportions damages between the two. Similarly, the jury could be asked to assess the damages under the Fourth Amendment theory separately. Such an inquiry might help avoid the award of duplicative damages
 
 
 [13]
 The defendants have not set forth a basis for our jurisdiction over the state law issue
 
 
 [14]
 The officers' reliance on Grossman v. City of Portland, 33 F.3d 1200 (9th Cir.1994), is misplaced. In Grossman, we held that an individual police officer was entitled to qualified immunity for enforcing an ordinance that prohibited demonstrations in public parks without first obtaining a permit. The ordinance, which we held unconstitutional, clearly required that demonstrators obtain a permit. Grossman, 33 F.3d at 1210. If the officer had tried to act in accordance with the First Amendment, he would have had to ignore his clear duty under the statute. Here, by contrast, there was no direct conflict between the proclamation and the First Amendment. The officers were not forced to choose between complying with one or the other. To the contrary, in the present case the officers could easily have complied with both
 
 
 [15]
 Defendants contend that the arrests were proper because the arrestees were moving as a group, and therefore were failing to disperse in violation of the law. Although we do not have jurisdiction to decide the question because Judge Wilken found issues of fact that must be resolved, we note that if a large group was ordered to disperse at 24th and Mission, as Newlin contends, its members initially could have gone only north and south on Mission or east and west on 24th. A dispersing crowd cannot simply atomize. Within a few minutes of the dispersal order, there might have been a series of fairly large groups within a block of 24th and Mission in each direction, no matter how obediently the original gathering attempted to disperse. Thus, the fact that there were 30-50 people at 24th and Bartlett and another 30-50 people detained behind the police line at 23rd and Mission does not necessarily establish, as defendants contend, that plaintiffs had failed to disperse. In addition, the fact that Lieutenant Fortner stated that the group coming north on Mission was "strung out" suggests that it may, in fact, have been dispersing
 
 
 [16]
 The parties dispute whether the traffic codes created a valid basis for arresting them. The plaintiffs contend the defendants could not have justified the arrests on the basis that plaintiffs were blocking traffic, because the police had already blocked traffic. Thus, they contend that there was no traffic to be blocked by them and no violation of the municipal code, which prohibits willfully obstructing someone's passage. San Francisco Municipal Police Code § 22. The district judge agreed. Defendants Newlin, Cullop, and Arnold argue that Judge Wilken erred because it was reasonable for them to believe that plaintiffs were breaking the law because the police diverted traffic in response to the actions of the protesters. We need not resolve that dispute here. Even if some of the arrests were justified on the basis that the officers had reason to believe some arrestees were violating traffic codes, Judge Wilken found evidence in the record that the police knew or should have known that a large number of the arrestees had violated no traffic laws